IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF CALIFORNIA ex rel. LOI TRINH and ED TA-CHIANG HSU, | No. C 10-1904 CW |
| Plaintiffs, | ORDER GRANTING IN PART THE GOVERNMENTS' MOTION FOR SUMMARY JUDGMENT; DENYING THE CENTERS' CROSS-MOTION FOR SUMMARY JUDGMENT; DENYING THE CENTERS' MOTION TO STRIKE (Docket Nos. 93, 114, 143) |
| v. | |
| NORTHEAST MEDICAL SERVICES, INC., | |
| Defendant. | |
| ═══════════════════════════════/ | |
| NORTHEAST MEDICAL SERVICES, INC., | No. C 12-2895 CW (Docket Nos. 68, 86) |
| Plaintiff, | |
| v. | |
| CAL. DEP'T HEALTH CARE SERVICES; TOBY DOUGLAS, Director of the Cal. Department of Health Care Services; CAL. HEALTH & HUMAN SERVICES AGENCY; STATE OF CALIFORNIA; U.S. DEP'T HEALTH & HUMAN SERVICES; KATHLEEN SEBELIUS, Secretary of Health and Human Services; | |
| Defendants. | |
| ═══════════════════════════════/ | |
| NORTHEAST MEDICAL SERVICES, INC., | No. C 10-2433 CW (Docket Nos. 67, 81) |
| Plaintiff, | |
| v. | |
| CAL. DEP'T HEALTH CARE SERVICES; TOBY DOUGLAS, Director of the Cal. Department of Health Care Services; CAL. HEALTH & HUMAN SERVICES AGENCY; STATE OF CALIFORNIA, | |
| Defendants. | |
| ═══════════════════════════════/ | |

LA CLINICA DE LA RAZA, INC.,                    No. C 10-4605 CW
                                                (Docket Nos. 50,
        Plaintiff,                              65)

    v.

CAL. DEP'T HEALTH CARE SERVICES;
TOBY DOUGLAS, Director of the
Cal. Department of Health Care
Services; CAL. HEALTH & HUMAN
SERVICES AGENCY; STATE OF
CALIFORNIA,

        Defendants.[1]
═══════════════════════════════/

    The parties in these four related actions dispute the scope

of their respective obligations under the Medicaid and Medicare

Acts.  In the first of these actions, the United States of America

and the State of California (collectively, the Governments) assert

claims against Northeast Medical Services, Inc. (NEMS) under the

federal False Claims Act (FCA) and California False Claims Act

(CFCA).  NEMS asserts counterclaims for declaratory and injunctive

relief in that action and, in a separate action, asserts related

claims challenging the Governments' implementation of the Medicaid

program.  Finally, in the two remaining actions, NEMS and La

Clinica de la Raza, Inc. (collectively, the Centers) assert claims

for declaratory and injunctive relief against various California

healthcare agencies and administrators, challenging their

implementation of the Medicare Part D program.

    The Governments move for summary judgment in all four

actions.  The Centers cross-move for summary judgment and move to

strike the Governments' post-hearing filings.  After considering

─────────────────────

    [1] The Court has substituted Toby Douglas as a Defendant in the 10-
2433 and 10-4605 actions pursuant to Federal Rule of Civil Procedure
25(d).

**United States District Court**
For the Northern District of California

the parties' submissions and oral argument, the Court grants in part the Governments' motion for summary judgment and denies it in part, denies the Centers' cross-motion for summary judgment, and denies the Centers' motion to strike.

BACKGROUND

The Centers are nonprofit healthcare organizations which provide medical services to low-income communities in the San Francisco bay area.  Each organization receives funding from the United States and the State of California under the Medicaid and Medicare programs for operating as a "federally-qualified health center" (FQHC).  As a condition of this funding, the organizations are required to report certain information about their operations and finances to the Governments.

Two of these actions (Civil Case Nos. 10-1904 and 12-2895) arise out of a dispute concerning the scope of NEMS's financial reporting obligations under the Medicaid Act.  The other two actions (Civil Case Nos. 10-2433 and 10-4605), which were originally assigned to the Hon. Richard Seeborg of this Court, arise out of a dispute concerning the Governments' chosen method of reimbursing the Centers for certain services they provide under the Medicare Part D program.  Each of these disputes is outlined below.

A.   The Medicaid Act and the 10-1904 and 12-2895 Actions

Medicaid is a federal program that offers participating states financial assistance to provide medical services to the poor.  "Participation by states is voluntary, but those that choose to participate must comply both with statutory requirements imposed by the Medicaid Act and with regulations promulgated by

the Secretary of Health and Human Services." <u>Alaska Dep't of</u>
<u>Health & Soc. Servs. v. Centers for Medicare & Medicaid Servs.</u>,
424 F.3d 931, 935 (9th Cir. 2005).  One of these requirements is
that participating states fully reimburse FQHCs, like the Centers,
for the services they provide to Medicaid enrollees.  42 U.S.C.
§ 1396a(bb).

California participates in Medicaid through its Medi-Cal
program.  Cal. Welf. & Inst. Code § 10740.  It is therefore
required to reimburse FQHCs for their reasonable costs in
providing healthcare to Medicaid enrollees.  The state reimburses
each FQHC at a facility-specific rate based on the average amount
that FQHC spends each time an eligible beneficiary visits the
facility.[2]  Reimbursement payments are calculated by multiplying
the facility's per-visit reimbursement rate by the number of
visits to that facility by eligible beneficiaries.

While California's Department of Healthcare Services (DHCS)
bears primary responsibility for administering the Medi-Cal
program, California also contracts with "managed care
organizations" (MCOs) to provide care to program beneficiaries.
The Medicaid Act expressly authorizes participating states to
provide services through these MCOs.  <u>See</u> 42 U.S.C. § 1396b(m).
Typically, when a state enters into a contract with an MCO, the
MCO assumes part of the state's responsibility for reimbursing
FQHCs that serve Medicaid enrollees in the MCO's service area.

---

[2] The Department of Health and Human Services determines each
FQHC's average cost-per-visit by taking the FQHC's reported average
cost-per-visit during fiscal years for 1999 and 2000 and adjusting that
figure annually according to the "Medicare Economic Index."  <u>See</u>
<u>generally</u> 42 U.S.C. § 1396a(bb) (describing the payment system for
reimbursing FQHCs).

Docket No. 94,[3] 1st Zavala Decl. ¶ 16.  The MCO's specific payment obligations are usually set forth in a contract between the MCO and the FQHC.  If the MCO's payments fail to compensate the FQHC for its full costs in serving Medicaid enrollees -- that is, if the MCO's reimbursement rate falls below the FQHC's per-visit reimbursement rate -- then the state must provide the FQHC with a "supplemental payment" to make up for this shortfall.  42 U.S.C. § 1396a(bb)(5).  Federal law requires that these supplemental payments be made "pursuant to a payment schedule agreed to by the state and the Federally-qualified health center . . . , but in no case less frequently than every 4 months."  Id.

In California, these ongoing supplemental payments are known as "wraparound payments."  1st Zavala Decl. ¶¶ 12-14.[4]  FQHCs typically submit requests for these wraparound payments to DHCS on an "ongoing basis," which may be "daily, weekly, bi-weekly, or monthly, depending on each clinic's preference or business model."  Id. ¶ 12.  Whenever DHCS receives a payment request from an FQHC, the agency issues a wraparound payment "based on a weighted average of all MCO visits and payments received by [that] FQHC."  Id. ¶ 18.

Because these wraparound payments are based on estimates of how much each FQHC is owed, DHCS invites FQHCs to participate in an annual "reconciliation" process at the end of each fiscal year to ensure that every FQHC actually received full compensation for every Medi-Cal visit.  To participate in this process, the FQHC

---

[3] Unless otherwise stated, all docket citations in this order refer to the docket in the 10-1904 action.
[4] The Governments also refer to these payments as "Code 18" payments.  1st Zavala Decl. ¶ 18.

United States District Court
For the Northern District of California

must submit a reconciliation request to DHCS reporting how many Medi-Cal visits it received that year, how much money it expended on those visits (calculated according to the FQHC's facility-specific per-visit reimbursement rate), and how much money it received from MCOs for those visits.  See 1st Zavala Decl., Exs. 4-5, 2013 DHCS Form 3097 & Instructions.  If DHCS determines that its wraparound payments have not fully compensated the FQHC for the shortfall in MCO payments, then the agency pays the remaining amount.  Conversely, if DHCS determines from the reconciliation request that the FQHC has been overcompensated, then the FQHC must return any excess funds to DHCS.

In May 2010, two former NEMS employees, Loi Trinh and Ed Ta-Chiang Hsu, filed a qui tam action (No. 10-1904) against NEMS, alleging that the organization had misreported financial information in several of its annual reconciliation requests.  In particular, they alleged that NEMS had knowingly underreported the payments it received from a local MCO on its annual reconciliation reports in order to recoup inflated reconciliation payments from DHCS.  Trinh and Hsu asserted claims on behalf of both Governments under the FCA, 31 U.S.C. §§ 3729 et seq., and CFCA, Cal. Gov't Code §§ 12650 et seq.  They did not serve NEMS with their complaint, however, because the FCA precluded them from doing so until the Governments had an opportunity to investigate their allegations and decided whether or not to intervene.  See 31 U.S.C. § 3730(b)(2).  The docket therefore remained under seal until the Governments completed their investigation.

NEMS first learned that it was the subject of a federal investigation in May 2011 when the Department of Health and Human

6

Services (HHS) served it with a civil investigative demand. However, it did not learn of the 10-1904 action until February 2012, when representatives from HHS and the United States Attorney's Office (USAO) for the Northern District of California disclosed this information to NEMS during a conference call. Two months later, in April 2012, the USAO sent NEMS a letter to inquire about the possibility of settling the 10-1904 action.

In June 2012, NEMS filed an action (No. 12-2895) against the Governments seeking declaratory judgment that it had not misrepresented its finances on any reconciliation reports and that it had fully complied with the requirements of the Medicaid Act. NEMS also asserted a claim for injunctive relief under 42 U.S.C. § 1983 charging DHCS and its director with failing to make fully compensatory supplemental payments every four months, as required to by the Medicaid Act.

This Court related the 12-2895 and 10-1904 actions in July 2012. The following month, the United States elected to intervene in the 10-1904 action, prompting the Court to unseal the docket in that case. After the State of California elected to intervene in that action in January 2013, the Governments filed their joint complaint-in-intervention against NEMS. In the complaint, they allege that NEMS failed to disclose all of the payments that it received from the San Francisco Health Plan (SFHP), a local MCO, on its annual reconciliation requests submitted to DHCS. The Governments assert that, as a result of NEMS's failure to report this information, NEMS received, between 2001 and 2010, roughly twenty million dollars in reconciliation payments to which it was not entitled.

In February 2013, this Court dismissed all but one of NEMS's claims in the 12-2895 action.  It found that NEMS had failed to establish federal subject matter jurisdiction over all of its claims other than the § 1983 claim against DHCS.  Because the dismissed claims arose from the same dispute as the Governments' claims against NEMS in the 10-1904 action, the Court granted NEMS leave to amend its dismissed claims and assert them as counterclaims in that action.  In May 2013, after unsuccessfully moving to dismiss the Governments' complaint-in-intervention, NEMS filed its answer in the 10-1904 action and asserted its previously dismissed claims as counterclaims.

B.    Medicare Part D and the 10-2433 and 10-4605 Actions

Medicare is a federal health insurance program that provides benefits to people with disabilities and people over age sixty-five.  See 42 U.S.C. §§ 1395 et seq.  The Medicare Act is divided into several parts, each of which deals with a different set of benefits.  Part D, which pertains to prescription drug benefits, is the only part relevant here.

In 2006, Congress passed legislation expanding Part D coverage to individuals who qualify for benefits under both Medicaid and Medicare, a group known as "dual-eligibles."  This legislation effectively shifted responsibility for paying dual-eligibles' prescription drug costs from state Medicaid programs to Medicare.  See 42 U.S.C. § 1396u-5(d)(1).  Because of this shift, FQHCs in California must now seek reimbursement under Medicare Part D, rather than Medi-Cal, for the prescription drug services they provide to dual-eligibles.  Previously, FQHCs were reimbursed for these services in the same way that they were reimbursed for

**United States District Court**
For the Northern District of California

all other of the other services they provided to Medi-Cal beneficiaries: that is, via the combination of wraparound and reconciliation payments described above.

DHCS offered FQHCs two options for seeking reimbursement for prescription drug services under Medicare Part D.  Under the first option (Option 1), the FQHC would adjust its per-visit reimbursement rate by subtracting the costs of all prescription drug services, for both dual-eligibles and other Medi-Cal beneficiaries, and seek reimbursements directly from HHS for its services to dual-eligibles; DHCS would then reimburse the FQHC at a separate per-visit rate for the prescription drug services it provided to non dual-eligibles.  Under the second option (Option 2), the FQHC would continue to receive reimbursements from DHCS at the same per-visit reimbursement rate but, during the annual reconciliation process, would pay back to DHCS any funding that the FQHC received under Medicare Part D during that fiscal year for its prescription drug services to dual-eligibles.  Following the Part D expansion, NEMS and La Clinica both initially chose to proceed under Option 2.  NEMS switched to Option 1 in 2009.

In June 2010, NEMS filed a declaratory judgment action (No. 10-2433) against DHCS and its director challenging the agency's efforts to implement the Medicare Part D expansion in California.  Specifically, NEMS alleged that both reimbursement options offered by DHCS violated federal law.  La Clinica, represented by the same counsel as NEMS, filed a nearly identical action (No. 10-4605) against DHCS and its director in October 2010.  The two cases were consolidated in November 2010.

In June 2011, Judge Seeborg dismissed the Centers' claims. He found that, because the Centers were seeking to recover Part D funds that they had previously paid to DHCS under Option 2, they were essentially asserting claims against the State for retrospective monetary relief, which is precluded by the Eleventh Amendment.  The Centers appealed the order of dismissal in July 2011.

In April 2013, the Ninth Circuit affirmed the order of dismissal in part and reversed it in part.  North East Med. Servs. v. Cal. Dep't Health Care Servs., 712 F.3d 461, 470-71 (9th Cir. 2013) (NEMS).  It held that the district court properly found that the Eleventh Amendment barred the Centers from pursuing monetary relief but erred in dismissing the Centers' claims in their entirety.  It reasoned that some of the Centers' claims against the director of DHCS could potentially be construed as injunctive relief claims and "under Ex parte Young, the Eleventh Amendment generally does not bar suits for prospective, non-monetary relief against state officers."  Id. at 466.  The court highlighted two claims, in particular, that might fall under the Ex Parte Young exception to the Eleventh Amendment.  First, it found that one of NEMS's claims could be construed as claim for prospective relief insofar as NEMS was seeking to avoid future liability for its past failures to comply with Option 2, such as when it refused to pay DHCS the Medicare Part D money that it received in 2008.  Id. at 470 ("While California has not demanded payment, it has maintained that it is entitled to it.  This leaves open the possibility that California will prospectively apply Option 2 to NEMS for fiscal year 2008 when California tries to extract payment from NEMS in

the future."). Second, the court found that one of La Clinica's claims might also be construed as a claim for prospective relief insofar as it was seeking to avoid complying with its obligations under Option 2 in the future.[5] Id. ("La Clinica continues to pay Medicare Part D payments over to California under Option 2. As such, it argues that it is entitled to declaratory and injunctive relief barring any future attempt by California to collect La Clinica's Part D payments."). Because the Ninth Circuit found that both of these claims "arguably seek genuine prospective relief," id. at 466, it remanded "to allow the district court to assess Ex Parte Young's application to: (1) NEMS's claim to injunctive relief for fiscal year 2008, and (2) La Clinica's claims arising from prospective application of Option 2." Id. at 471.

    C.   The Instant Motions

    In April 2013, one week after the Ninth Circuit issued its decision, this Court related the 12-2895 and 10-1904 actions to the 10-2433 and 10-4605 actions and set a consolidated briefing schedule for dispositive motions in all four actions. Pursuant to that schedule, the Governments jointly submitted their consolidated motion for summary judgment in September 2013. The Centers jointly cross-moved for summary judgment in November 2013.

---

    [5] The Ninth Circuit did not find that NEMS's claims for declaratory relief regarding DHCS's future enforcement of Option 1 contained a prospective component. This is likely because "NEMS conceded in both its briefing and at oral argument that it suffers no ongoing harm since proceeding under Option 1." NEMS, 712 F.3d at 465.

DISCUSSION

I.   Motions for Summary Judgment

     A.   Legal Standard

     Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

     The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

     Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

          The moving party may produce evidence negating
          an essential element of the nonmoving party's

12

> case, or, after suitable discovery, the moving
> party may show that the nonmoving party does
> not have enough evidence of an essential
> element of its claim or defense to carry its
> ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  Nissan, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id.  This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  Id. at 1107.

13

United States District Court
For the Northern District of California

B.   No. 10-1904

1.   The Governments' Medicaid Claims

The Governments assert that NEMS violated the FCA and CFCA by underreporting the payments it received from SFHP on the reconciliation requests it submitted to DHCS between 2001 and 2010.  NEMS contends that it cannot be held liable under the FCA and CFCA because it was not required to report all its SFHP payments to DHCS under the Medicaid Act.

The FCA imposes civil liability on anyone who knowingly presents the federal government with "a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a); Alderson v. United States, 686 F.3d 791, 794 (9th Cir. 2012).  The statute is "'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.'"  United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1170 (9th Cir. 2006) (quoting United States v. Neifert-White Co., 390 U.S. 228, 232 (1968)).  The Ninth Circuit has held that "the scope of false or fraudulent claims should be broadly construed."  Id.

The CFCA imposes civil liability on any person who knowingly presents "a false or fraudulent claim for payment or approval" to the State of California or one of its political subdivisions. Because the CFCA is based on the FCA, California courts typically look to FCA precedents to construe the scope of the CFCA.  State v. Altus Fin., S.A., 36 Cal. 4th 1284, 1299 (2005) ("[T]he CFCA 'is patterned on similar federal legislation' and it is appropriate to look to precedent construing the equivalent federal act." (citations omitted)).

United States District Court
For the Northern District of California

Here, the Governments have submitted sufficient evidence to support an inference that NEMS deliberately withheld information in its annual reconciliation requests about certain payments it received from SFHP.  They point to a declaration from Hsu -- one of the relators in this action and NEMS's former chief financial officer -- in which he states that NEMS's chief executive officer, Sophie Wong, specifically instructed him in 2008 not to report all of the SFHP payments on the organization's reconciliation requests.  Docket No. 98-1, Hsu Decl. ¶¶ 7-8.  Hsu states that, even after he warned Wong that it was potentially illegal to withhold this information, "Wong told [him] not to report all of the SFHP payments received by NEMS on the FQHC reconciliation reports."  Id. ¶ 8.  He also asserts that he was "forced to resign" shortly after one of his discussions with Wong about whether or not to report the SFHP payments.  Id. ¶ 9.  These statements are sufficient to support an inference that NEMS deliberately reported false information on its reconciliation requests.

In addition to the Hsu declaration, the Governments have submitted a copy of DHCS's current reconciliation request form, which specifically instructs FQHCs to "[r]eport **all** Medi-Cal Managed Care Plan payments (both fee-for-service {FFS} and capitated) in this column."  1st Zavala Decl., Ex. 5, Form 3097 Instructions, at 4 (bold and italic emphasis in original).  The Governments contend that these instructions show that, even if NEMS believed it was not required by the Medicaid Act to report every MCO payment it received to DHCS, or that these payments were not all material to the reconciliation request, its failure to

report "all" of these payments still constituted a violation of the FCA and CFCA.

NEMS does not dispute that it failed to report all of its SFHP payments in its reconciliation requests between 2001 and 2010.  It contends, however, that it was never required to report all of these payments to DHCS during that period.  For support, NEMS points to the 2005 version of DHCS's reconciliation request instructions, which contains slightly different language than the 2013 version submitted by the Governments.  Specifically, the 2005 version instructs FQHCs, "Report all Managed Care plan payments (both fee-for-service and capitated) for Medi-Cal and Medi-Cal/Medicare visits in this column."  Docket No. 108, Guevara Decl., Ex. K, at 3 (emphasis added).  NEMS asserts that the additional language in the 2005 version -- "for Medi-Cal and Medi-Cal/Medicare visits" -- justified its decision not to report all of its received SFHP payments because those payments were meant to cover more than just the costs of "Medi-Cal and Medi-Cal/Medicare visits."

NEMS asserts that its interpretation of this reporting requirement was consistent with the Governments' own understanding of the term "Medi-Cal and Medi-Cal/Medicare visits" during the relevant period.  NEMS cites the testimony of Ralph Zavala, an audit manager for DHCS, who acknowledged during his deposition that FQHCs sometimes provide "specialty" services that do not qualify as "Medi-Cal or Medi-Cal/Medicare visits."  Guevara Decl., Ex. B, Zavala Depo. 45:6-46:4.  If SFHP agreed to provide payments to NEMS to cover the cost of these specialty services -- as NEMS alleges -- then NEMS may have been justified in reporting only a

United States District Court
For the Northern District of California

portion of the money it received from SFHP on its annual reconciliation requests.

NEMS has not presented sufficient evidence to establish that it had such an agreement with SFHP.[6]  Nor has NEMS presented sufficient evidence to show that the reconciliation request instructions included the term "Medi-Cal or Medi-Cal/Medicare visits" every year between 2001 and 2010.  Most importantly, NEMS has not provided any evidence, other than the conclusory testimony of a former employee, to show that it actually incurred costs in providing specialty services and that the only payments it failed to disclose on its reconciliation reports were the SFHP payments intended to cover the costs of providing those specialty services. Nevertheless, NEMS has presented sufficient evidence to support an inference that it did not knowingly report false information to DHCS on its reconciliation requests.

Accordingly, neither the Governments nor NEMS is entitled to summary judgment on the FCA and CFCA claims.[7]

_____

[6] Although NEMS has provided a copy of its contract with SFHP, the contract, standing alone, does not make clear what proportion of SFHP's payments to NEMS are intended to cover specialty services and which are intended to cover Medi-Cal visits.

[7] The Governments indicated, both at the hearing and in their post-hearing submission, that NEMS's fraudulent conduct is apparent from the face of the reconciliation requests that it submitted between 2001 and 2010 because those reports documented how many Medi-Cal visits NEMS reported each year.  However, because NEMS has presented evidence to suggest that it was justified in reporting less than all of the payments it received from SFHP, the reconciliation requests are not sufficient, without more, to establish fraud.  To show fraud based on the documents alone, the Governments would have to identify some discrepancy or inconsistency in NEMS's own reporting practices, such as a discrepancy between the number of Medi-Cal visits reported in NEMS's interim supplemental payment requests and the number of such visits reported in its year-end reconciliation requests.

2.   Relators' Medicaid Claims

NEMS argues that the relators waived their rights to assert any qui tam claims against it because they had both previously signed settlement agreements releasing various claims against the organization.  As explained at the hearing, even if the relators did waive their claims against NEMS -- and it is not clear that they did -- this would not protect NEMS against liability under the FCA or CFCA because the Governments have now intervened in this action and have assumed responsibility for prosecuting the FCA and CFCA claims.  If NEMS does not believe the Governments should pay the relators incentive awards under the FCA and CFCA, it would need to pursue an available remedy, if any, in an appropriate forum.  Although courts have some discretion to determine the size of a relator's incentive award under the FCA and CFCA, that discretion is limited to deciding how much to award the relator based on whether the government elected to intervene in the action and whether the action is founded "primarily on information of which the relator is not the original source." United States ex rel. Kelly v. Boeing Co., 9 F.3d 743, 747 (9th Cir. 1993) (citing 31 U.S.C. § 3730(d)).  The parties have not addressed this issue in their briefs.

3.   NEMS's Medicaid Counterclaims

NEMS asserts three counterclaims in the 10-1904 action.  The first two are directed at the Federal Government and appear to be based on the letter that the USAO sent NEMS in April 2012 to gauge its interest in settling the qui tam action.  In these counterclaims, NEMS asserts that the "legal conclusions expressed in the [USAO] letter" are "invalid," "contrary to law," and

18

United States District Court
For the Northern District of California

"inconsistent" with the Medicaid Act.  <u>See</u> Docket No. 60, NEMS's Answer & Counterclaims ¶¶ 135-36, 139-40.  NEMS appears to have abandoned these counterclaims at this stage.  It does not discuss either of them in its summary judgment briefs (except to withdraw one of them in a footnote to its reply brief) and has not submitted any evidence to support them here.  When asked at the hearing if there was any reason the Court should not grant summary judgment to the Federal Government on these counterclaims, NEMS replied that "you should go ahead and grant summary judgment on this."  Docket No. 140, 1/23/2014 Hrg. Tr. 27:24-28:2.  Thus, the Court grants summary judgment to the Federal Government on these counterclaims.

NEMS's third counterclaim is asserted against DHCS and is entirely duplicative of a claim that it previously asserted in the 10-2433 action.  In that claim, NEMS sought to recover certain Medicare Part D funds from DHCS for prescription drug services that it delivered prior to 2009.  Judge Seeborg found that this claim was barred by the Eleventh Amendment and the Ninth Circuit affirmed his dismissal of the claim.  <u>NEMS</u>, 712 F.3d at 766.  NEMS contends that the Ninth Circuit's decision dismissing this claim is no longer valid because the State subsequently waived its Eleventh Amendment immunity by electing to intervene in the <u>qui tam</u> action.

This argument is not persuasive.  The Ninth Circuit has held that when a state files suit against a defendant in federal court, it does not waive its Eleventh Amendment immunity with respect to all possible counterclaims that defendant might bring; rather, the state's waiver of Eleventh Amendment immunity is limited to those

counterclaims that "arise from the same transaction or occurrence as the state's claim." See In re Lazar, 237 F.3d 967, 978 (9th Cir. 2001).  In this case, NEMS's counterclaim against DHCS does not arise from the same transaction or occurrence as the State's CFCA claim.  Indeed, NEMS's counterclaim arises from a dispute concerning the State's implementation of the 2006 Medicare Part D expansion, which is entirely distinct from any dispute concerning NEMS's alleged failure to disclose its MCO payments on annual reconciliation requests submitted between 2001 and 2010. Accordingly, the State has not waived its Eleventh Amendment immunity with respect to this counterclaim and the Ninth Circuit's decision dismissing this claim in the 10-2433 action controls here.  The State is therefore entitled to summary judgment on this counterclaim.

C.   No. 12-2895: NEMS's Untimely Payments Action

NEMS's only remaining claim in the 12-2895 action is its § 1983 claim based on DHCS's alleged failure to make timely wraparound payments as required by the Medicaid statute.

As noted above, the Medicaid Act requires that participating states make supplemental payments to FQHCs "pursuant to a payment schedule agreed to by the State and the Federally-qualified health center . . . , but in no case less frequently than every 4 months."  42 U.S.C. § 1396a(bb)(5).  Other courts have recognized that an FQHC can bring a § 1983 action to enforce its right to timely reconciliation payments under this provision.  Three Lower Counties Cmty. Health Servs. v. Maryland, 498 F.3d 294, 303 (4th Cir. 2007) ("At bottom, we conclude that the Medicaid Act requires Maryland to pay FQHCs fully compensatory supplemental payments not

**United States District Court**
For the Northern District of California

less frequently than four months after Maryland has received the claim for supplemental payment, as required by 42 U.S.C. § 1396a(bb)(5).”); <u>Rio Grande Community Health Ctr., Inc. v. Rullan</u>, 397 F.3d 56, 75 (1st Cir. 2005) (“We conclude that a private action can be brought by an FQHC under section 1983 to enforce 42 U.S.C. § 1396a(bb).”).

In <u>Three Lower Counties</u>, the Fourth Circuit held that Maryland’s system for making wraparound payments -- which, like DHCS’s system, relied on a combination of estimated interim payments and year-end reconciliation payments -- violated § 1396a(bb).  498 F.3d at 296, 299 (“Under the practice Maryland has adopted, the Department of Health makes a portion of the supplemental payment in advance, labeling the prospective payment as an ‘interim supplemental payment,’ and the remaining portion retrospectively, labeling the balance as a payment in ‘reconciliation’ of the account.”).  Citing the plain language of the statute, the Fourth Circuit reversed the district court’s order granting summary judgment to the state agency tasked with administering Medicaid in Maryland.  The appellate court explained that Maryland’s interim payments did not satisfy § 1396a(bb) because they were not fully compensatory.  In reaching this conclusion, the Fourth Circuit specifically rejected the district court’s reasoning that “it would be too administratively burdensome for the Department of Health to make a fully compensatory supplemental payment to FQHCs at least once every four months.”  <u>Id.</u> at 300.

Here, the record supports an inference that DHCS fails to make fully compensatory wraparound payments every four months.

United States District Court
For the Northern District of California

The Governments' own evidence indicates that DHCS's wraparound payments are based on an estimate of the shortfall in MCO payments made to each FQHC over a given billing period rather than the FQHC's exact costs.  See 1st Zavala Decl. ¶ 15 (stating that wraparound payments "consist of weighted averages of the difference between a clinic's total revenue received from a particular third party payer type and the amount the clinic would have otherwise received if it had been reimbursed at the clinic's PPS rate for providing the services that were partially reimbursed by the third party payer" (emphasis added)).  Furthermore, DHCS's own reconciliation request form states that it can take up to three years for the agency to complete the reconciliation process. See id., Ex. 5, 2013 DHCS Form 3097 & Instructions, at 1 ("The Department has 3 years from date these forms are received and accepted for processing, to determine if the total payments were greater than or less than the provider's allowable PPS reimbursement.").  This evidence is sufficient to support an inference that DHCS's wraparound payment system violates § 1396a(bb).

That said, a dispute of material fact remains as to whether or not DHCS's wraparound payment system fully compensated NEMS in particular for its FQHC services.  As noted above, the Governments have presented sufficient evidence to support an inference that NEMS repeatedly obtained inflated reconciliation payments from DHCS by deliberately underreporting the payments it received from SFHP on its reconciliation reports.  This evidence -- which suggests that NEMS was over-compensated rather than under-

United States District Court
For the Northern District of California

1  compensated -- precludes the Court from granting summary judgment

2  to any party on this claim.

3      D.   Nos. 10-2433 and 10-4605: The Centers' Medicare Claims

4      As previously explained, the Ninth Circuit remanded these

5  actions "to allow the district court to assess Ex Parte Young's

6  application to: (1) NEMS's claim to injunctive relief for fiscal

7  year 2008, and (2) La Clinica's claims arising from prospective

8  application of Option 2." NEMS, 712 F.3d at 471.

9      With respect to NEMS's claim, Ex Parte Young does not apply

10 because NEMS is essentially seeking retrospective monetary relief.

11 The Ninth Circuit has made clear that "whether relief is

12 prospective or retrospective in the Medicaid payment context turns

13 on the date of service, not the date of payment." Independent

14 Living Center of S. Cal. v. Maxwell-Jolly, 572 F.3d 644, 661 n.19

15 (9th Cir. 2009), vacated and remanded on other grounds sub nom.

16 Douglas v. Indep. Living Ctr. of S. Cal., Inc., 132 S. Ct. 1204

17 (2012).  Thus, under the Eleventh Amendment, a healthcare provider

18 may not obtain an injunction to compel a state to reimburse it for

19 Medicaid or Medicare services that it has already rendered.

20 Wisconsin Hosp. Ass'n v. Reivitz, 820 F.2d 863, 867 (7th Cir.

21 1987) ("The hospitals argue that because no final settling up for

22 the year has been made, the judgment they seek is prospective

23 only: a direction to the defendants to ignore the April 30 statute

24 in deciding how much money to pay the hospitals.  But this is a

25 misuse of the word 'prospective.'").  Here, NEMS is seeking

26 compensation for prescription drug services that it provided in

27 2008, more than a year before it filed the 10-2433 action.

28 Although NEMS is seeking that compensation in the form of an order

compelling DHCS to forgive its 2008 debt -- rather than an order compelling a new payment -- the relief it is pursuing is still retrospective in nature; it is seeking future monetary relief based on past services.  Accordingly, NEMS's claim is barred by the Eleventh Amendment.

La Clinica's claim, in contrast, is not barred by the Eleventh Amendment because it is pursuing only prospective relief. As noted above, La Clinica is seeking an injunction that would release it from its obligation to comply with the requirements of Option 2 in the future.  Because this injunction would not compel DHCS to compensate La Clinica for services that it has already rendered, the Eleventh Amendment does not preclude La Clinica from pursuing this form of relief.

Nonetheless, La Clinica's claim fails for a different reason -- specifically, because it still has the option to proceed under Option 1 rather than Option 2.  Although the Centers initially alleged that Options 1 and 2 are both unlawful, they have not identified any illegality or harm associated with Option 1.  The Ninth Circuit specifically noted that NEMS, which was represented on appeal by the same counsel as La Clinica, "conceded in both its briefing and at oral argument that it suffers no ongoing harm since proceeding under Option 1." NEMS, 712 F.3d at 465.  More recently, at the summary judgment hearing, the Centers stated that Option 1 is "irrelevant for the purposes of this case, because it's been accepted by NEMS, and NEMS is not complaining about Option One with respect to having moved to Option One when it did in 2009." 1/23/2014 Hrg. Tr. 24:15-:18. Later, when the Court asked if it needed to "worry about whether

Option One is illegal or not," the Centers replied, "No, you do not." Id. 25:16-:18.  Although the Centers stated at one point that Option 1 might harm FQHCs by potentially exposing them to increased competition from non-FQHCs, immediately after proposing that theory, the Centers conceded that this increase in competition "hasn't happened, and it's unlikely to happen." Id. 30:8-:17.  Because these concerns about the risks of proceeding under Option 1 are highly speculative concerns and not supported by the evidence, they do not provide adequate support for La Clinica's injunctive relief claim.

In sum, NEMS has not overcome the State's Eleventh Amendment immunity and La Clinica has not presented any evidence to suggest that it cannot proceed under Option 1; La Clinica's rejection of Option 2 is therefore moot.  Accordingly, the Governments are entitled to summary judgment on the Centers' two remaining claims in the 10-2433 and 10-4605 actions.

The Governments are also entitled to summary judgment on these claims because the Centers have failed to present sufficient evidence to support an inference that Option 2 is unlawful.[8]  The Centers allege that, under Option 2, they cannot obtain full compensation for the prescription drug services they provide to dual-eligibles because they are forced to report all of the Medicare Part D funding they receive to DHCS rather than just the portion of funds used to serve dual-eligibles.  The evidence in the record does not support this allegation.  DHCS's instructions

---

[8] The Ninth Circuit and Judge Seeborg both focused exclusively on the Eleventh Amendment issue in this case and did not reach the merits of the Centers' claim that Option 2 is unlawful.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

for submitting reconciliation requests state that FQHCs are only required to report the portion of their Medicare Part D funds that they received specifically for providing prescription drug services to dual-eligibles.  The instructions direct the applicant to "[r]eport the payments received from Medicare or its fiscal intermediary for Medicare/Medi-Cal dual eligible patients who are not enrolled in a Medi-Cal Managed Care Plan and are not enrolled in a capitated MAP."  1st Zavala Decl., Ex. 5, 2013 DHCS Form 3097 & Instructions, at 5 (emphasis in original).  The only evidence that the Centers cite to support their characterization of Option 2 is a provision of California's 2006 Medi-Cal plan amendment, which says that DHCS will supplement certain third-party payments to FQHCs.  This provision does not state or imply that FQHCs are required to report all of the Medicare Part D funds they receive. See 1st Zavala Decl., Ex. 1, 2006 State Plan Amendment, at 6S.[9] Thus, even if NEMS's remaining claim was not barred by the Eleventh Amendment and La Clinica's remaining claim was not moot, the Governments would still be entitled to summary judgment on the Centers' claims in these actions because the Centers have not presented sufficient evidence to support an inference that Option 2 violates federal law.

II.  Motion to Strike

On March 11, 2014, this Court issued an order directing the Governments to provide a citation to certain billing records to

---

[9] The Centers describe a hypothetical FQHC in their brief to illustrate their theory of how Option 2 could fail to compensate FQHCs for their prescription drug services to dual-eligibles.  See Docket No. 114, Centers' Cross-Mot. & Opp., at 27.  However, they do not identify any evidence to show that this hypothetical actually happened or could happen to them.

United States District Court
For the Northern District of California

which they had alluded during the hearing.  The order instructed the Governments not to supplement the citation with any additional arguments or evidence; in the event that the summary judgment record did not contain the billing records, the order directed them to submit a brief statement saying so.  On March 13, 2014, two days after the Court issued its order, the Governments submitted a two-page statement asserting that the summary judgment record did not contain the billing records.  The Governments also provided various citations to the summary judgment record that were not responsive to the Court's original request.  One week later, on March 19, 2014, the Centers moved to strike the Governments' post-hearing submission, arguing that the Governments had failed to comply with the Court's instructions.

Because the Governments' post-hearing submission substantially complies with the Court's March 11, 2014 order, the Centers' motion to strike is denied.  To the extent that the Governments' post-hearing submission contains supplemental arguments or citations not directly responsive to the Court's order, the Court does not rely on those arguments or citations here.  The Court relies only on the portion of the Governments' submission stating that the summary judgment record does not contain the billing records identified in the Court's original order.

                           CONCLUSION

For the reasons set forth above, the Governments' motion for summary judgment (Docket No. 93) is GRANTED in part and DENIED in part.  The Centers' cross-motion for summary judgment (Docket No. 114) is DENIED and the Centers' motion to strike (Docket No. 143)

is DENIED as moot.  The only claims that remain in this action are the Governments' FCA and CFCA claims against NEMS and NEMS's § 1983 claim against the State based on DHCS's alleged failure to comply with 42 U.S.C. § 1396a(bb).

The parties participated in a settlement conference with Judge Beeler in August 2013.  Since then, they have not notified the Court of any additional efforts to settle this case. Accordingly, the Court directs the parties to participate in a further settlement conference with Judge Beeler by September 10, 2014.  The parties shall ensure that all knowledgeable persons and agency representatives are present at the settlement conference.

A final pretrial conference will be held at 2:00 p.m. on October 8, 2014.  A five-day jury trial will commence at 8:30 a.m. on November 3, 2014.

IT IS SO ORDERED.

Dated: 5/13/2014

CLAUDIA WILKEN
United States District Judge