JOYCE R. BRANDA
Acting Assistant Attorney General

MELINDA HAAG
United States Attorney
ALEX G. TSE (CA Bar No. 152348)
Chief, Civil Division
ILA C. DEISS (NY Bar No. 3052909)
MELANIE L. PROCTOR (CA Bar No. 228971)
Assistant United States Attorneys
    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102
    Telephone: (415) 436-7124 (Deiss)
    ila.deiss@usdoj.gov

MICHAEL D. GRANSTON
DANIEL R. ANDERSON
EDWARD C. CROOKE
Attorneys, Civil Division
United States Department of Justice
    Ben Franklin Station, Box 261
    Washington, D.C. 20044
    Telephone: (202) 353-0426
    edward.crooke@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF CALIFORNIA, ex rel. LOI TRINH and ED TA-CHIANG HSU, <br><br> Plaintiffs, <br><br> v. <br><br> NORTH EAST MEDICAL SERVICES, <br><br> Defendant. | Case No.  10-cv-1904 CW <br><br> [CORRECTED] GOVERNMENTS' TRIAL BRIEF <br><br> Date:  January 21, 2015 <br> Time:  2:00 p.m. <br> Ctrm:  2, 4th Floor <br> The Honorable Claudia Wilken |

The United States and California (collectively, the "Governments") allege that for fiscal years 2001 through 2008, Defendant North East Medical Services ("NEMS") knowingly under-reported capitated Medi-Cal payments it received from a managed care organizations ("MCO") in order to receive inflated supplemental year-end payments it received directly from the California Medicaid program ("Medi-Cal").  By doing so, NEMS violated the federal False Claims Act (FCA), 31 U.S.C. §§ 3729-3733, and the California False Claims Act (CFCA), Cal. Gov't Code §§ 12650-12652, and was

1  unjustly enriched.  The Governments respectfully submit this Trial Brief in preparation for trial in the

2  above-captioned matter, which is scheduled to commence on February 2, 2015.

3  **I.        BACKGROUND**

4         **A.        The Medi-Cal Program**

5         Medicaid is a joint federal-state program that provides medical assistance to needy families and

6  individuals.  The program is financed both by the federal and state governments, and each participating

7  state administers its own state program according to federal guidelines.  42 U.S.C. § 1396, et seq.  The

8  Centers for Medicare & Medicaid Services ("CMS"), which is part of the United States Department of

9  Health and Human Services ("HHS"), oversees the Medicaid program.  Pharm. Research & Mfrs. of

10  Am. v. Walsh, 538 U.S. 644, 650, n. 3 (2003); *see also* 42 C.F.R. §§ 430.10, 430.15(b).

11         In California, Medi-Cal is administered and supervised by the California Department of Health

12  Care Services ("DHCS") (formerly, the "California Department of Health Services").  Cal. Welf. & Inst.

13  Code §§ 10740, 14000 et seq.  DHCS ensures that Medi-Cal provides covered services to eligible

14  beneficiaries and reimburses providers for covered services in compliance with the State Plan and with

15  federal and state laws and regulations.  42 C.F.R. §§ 431.1, 431.10; *see also* Cal. Welf. & Inst. Code

16  § 14000 et seq.; Cal. Code Regs., tit. 22, § 50000 *et seq*.

17         In some cases, DHCS contracts with MCOs to provide services to Medi-Cal beneficiaries.  For

18  example, DHCS contracts with the San Francisco Health Plan ("SFHP"), a licensed managed care entity,

19  to provide health care services to certain Medi-Cal beneficiaries in the San Francisco area.  Cal. Code

20  Regs. 22, § 53800; Cal. Welf. & Inst. Code § 14087.36; Chen Dep. 34:17-24.

21         **B.        Federally Qualified Healthcare Centers**

22         Federally Qualified Healthcare Centers ("FQHCs") receive federal grant money under Section

23  330 of the Public Health Service Act to provide certain medical services to underserved areas or

24  populations.  FQHCs also receive funding from Medi-Cal for services they provide to Medicaid

25  enrollees.  42 U.S.C. § 254b; 42 U.S.C. §§ 1396a(a)(1)(A), 1396d(a)(2)(C).

26         **FQHC Reimbursement**.  The Medi-Cal system for reimbursing FQHCs is designed and

27  intended to cover all of the FQHC's reasonable costs in providing FQHC services to Medi-Cal

28  beneficiaries.  ECF 94, Zavala Decl., ¶ 6, Exh. A.  In order to accomplish this objective, the State

1   establishes a facility-specific reimbursement rate for each FQHC called the prospective payment system

2   rate, or "PPS rate." *See* 42 U.S.C. § 1396a(bb); Cal. Welf. & Inst. Code § 14312.100.  To establish the

3   initial PPS rate, FQHCs submit a cost report reflecting their costs for the rate-setting year.  This initial

4   PPS rate is then annually increased based on the Medicare Economic Index.  ECF 94, Zavala Decl., ¶ 9.

5        When an FQHC provides services to a Medi-Cal beneficiary enrolled with a Medi-Cal MCO, the

6   MCO generally compensates the FQHC in the same manner that it compensates non-FQHC healthcare

7   providers.  Medi-Cal then makes a supplemental payment directly to the FQHC to ensure that the FQHC

8   receives the full PPS rate for those services.  This supplemental payment – commonly known as a

9   "wraparound" payment or "Code 18 payment" – is intended to make up any difference between the

10  compensation received from the MCO and the full PPS rate.  ECF 94, Zavala Decl., ¶¶ 16; 18.

11      **Annual Reconciliation**.  At the end of each fiscal year, DHCS engages in a "reconciliation"

12  process with each FQHC to ensure that the FQHC was reimbursed at the PPS rate for all covered

13  services provided to Medi-Cal beneficiaries.  As part of this reconciliation process, DHCS compares the

14  total amount of any MCO payments and supplemental wraparound payments received by the FQHC

15  during the year against the amount that the FQHC was entitled to receive based on the actual number of

16  visits provided by the FQHC and the FQHC's PPS rate for each visit.  ECF 94, Zavala Decl., ¶¶ 13, 20,

17  Exh. A.  In other words, DHCS compares what the FQHC actually received throughout the year for

18  covered services (i.e., all Medi-Cal MCO payments and Code 18 payments) against what the FQHC was

19  entitled to receive under the PPS system for those services (i.e., the PPS rate times the number of

20  covered visits).

21      As part of this process, DHCS requires each FQHC to submit a Reconciliation Request using

22  DHCS Form 3097.  ECF 94, Zavala Decl., ¶ 19.  On the Reconciliation Request, FQHCs must disclose,

23  inter alia, all third-party payments received for services provided to Medi-Cal beneficiaries.  Id. at ¶ 20.

24  Based on the information reported in the Reconciliation Request, DHCS either pays the remaining

25  amount owed to fully compensate the FQHC under its PPS rate for the number of covered visits during

26  that year, or alternatively, determines that the clinic has been over-compensated and requests

27  reimbursement to the State .  ECF 94, Zavala Decl., ¶ 13, 20-23, Exh. A.

28

## II.      CAUSES OF ACTION

### A.      False Claims Act

The FCA provides for liability on the part of any person who:

(1)      knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval;

(2)      knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

31 U.S.C. § 3729.   A "claim" is a demand for the payment of government money or the transfer of government property.  *United States v. Neifert-White Co.*, 390 U.S. 228 (1968); *United States v. Ekelman & Assocs.*, 532 F.2d 545 (6th Cir. 1976); *United States v. Veneziale*, 268 F.2d 504 (3d Cir. 1959).  The FCA is intended "to reach all types of fraud" and "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *Neifert-White*, 390 U.S. at 232.

The FCA's scienter requirement does not require proof that NEMS had specific intent to defraud. For purposes of the FCA, "knowledge" that the statement or document was false or fraudulent means that the defendant:

(1)      had actual knowledge that the claim was false;

(2)      acted in deliberate ignorance of the truth or falsity of the claim; or

(3)      acted in reckless disregard of the truth or falsity of the claim.

No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b).

### B.      California False Claims Act

Like the federal FCA, the CFCA imposes liability upon any person who "knowingly presents or causes to be presented to an officer or employee of the state . . . , a false claim for payment or approval." (at § 12651(a)(1)).  The ultimate purpose of the CFCA is to "protect the public treasury and the taxpayer," and the Act "must be construed broadly to give the widest possible coverage and effect to the

1    prohibitions and remedies it provides." *County of Kern v. Sparks*, 149 Cal. App. 4th 11, 17 (2007); Cal.

2    Gov't Code § 12655(a) (CFCA "shall be liberally construed and applied to promote the public interest").

3          To prove a violation of the CFCA, California must establish that (1) a claim was submitted (2)

4    for payment with government funds; (3) the claim was materially false; and (4) the defendant acted

5    "knowingly." *See, generally, Fassberg Constr. Co. v. Housing Auth. of Los Angeles*, 151 Cal. App. 4th

6    267 (2007); *City of Pomona v. Superior Court*, 89 Cal. App. 4th 793 (2001). The statute defines

7    "knowingly" to include acting: (A) with actual knowledge of the information, (B) in deliberate

8    ignorance of the truth or falsity of the information, or (C) with reckless disregard of the truth or falsity of

9    the information.

10          **C.    Federal and State Common Law Claim**

11          The Governments also assert a claim under the common law for unjust enrichment.  This theory

12    of recovery involves the rights of the United States under a nationwide program, and hence is governed

13    by federal common law.  *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1976).  Under the

14    equitable theory of unjust enrichment, "a person is unjustly enriched if the retention of [a] benefit would

15    be unjust."  Restatement of Restitution, § 1 (1937); *see also United States v. Bellecci*, 2008 WL 802367,

16    at *6 (E.D. Cal. Mar. 26, 2008); *Miniace v. Pacific Maritime Ass'n*, 424 F. Supp. 2d 1168, 1187 (N.D.

17    Cal. 2006). "[A] quasi-contract is not a contract at all but rather an equitable remedy thrust upon the

18    recipient of a benefit under conditions where that receipt amounts to unjust enrichment."  *Nossen v. Hoy*,

19    750 F. Supp. 740, 744 (E.D. Va.1990) (citations omitted).  The quasi-contract is a plaintiff's remedy at

20    law when the facts establish that a defendant has been unjustly enriched at the expense of the plaintiff,

21    but where the facts fail to establish that the parties established any form of agreement:  "To establish a

22    quasi-contract a plaintiff generally must show three elements:  (1) A benefit conferred on the defendant

23    by the plaintiff; (2) Knowledge on the part of the defendant of the conferring of the benefit; and (3)

24    Acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the

25    defendant to retain the benefit without paying for its value."  *Id*. at 744-45 (citations omitted).

26          California has likewise sued NEMS under the common law theory of unjust enrichment.  In

27    California, the phrase "unjust enrichment" is used in law to characterize the result or effect of a failure

28    to make restitution of or for property or benefits received under such circumstances as to give rise to a

Governments' Trial Brief
C10-1904 CW                                    5

1  legal or equitable obligation to account therefor.  See *Ajaxo Inc. v. E\*Trade Fin. Corp*, 187 Cal. App.

2  4th 1295 (2010).  In such cases, the defendant may be under a duty to give the plaintiff the amount by

3  which he has been enriched.  *Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 627-28 (1992).

4  **III.      KEY EVIDENCE TO BE INTRODUCED AT TRIAL**

5      NEMS is a non-profit corporation and FQHC with its primary offices in San Francisco,

6  California.  NEMS has three office locations, all of which fall under one tax ID number.  Wong Dep.

7  26:7-16; Wong Dep. 143:13-22.  Medi-Cal reimburses NEMS for services provided to Medi-Cal

8  beneficiaries.  Chen Dep. 45:13-46:1.

9      **A.      NEMS's Initial PPS Rate**

10      In 2000 and 2006, NEMS submitted two cost reports.  On both cost reports, NEMS certified that

11  to the best of its knowledge, the report was true and correct and a complete statement prepared from the

12  books and records of the FQHC in accordance with applicable instructions and that any "[i]ntentional

13  misrepresentation or falsification of information contained in these Work Sheets may be punished by

14  fine and/or imprisonment under federal law."   Medi-Cal used these cost reports to determine NEMS's

15  PPS rate.

16      **Clinics FHC11007F and FHC70714G**.  NEMS elected to use its 2000 cost report as the basis

17  for its initial PPS rate.  ECF 117, 2d Zavala Decl., ¶ 5, Exhs. 26, 27.  On May 31, 2001, NEMS

18  submitted to DHCS a single cost report covering both its primary clinic (FHC11007F) and one satellite

19  clinic (FHC70714G).  *Id*.  The cost report covered the period of January 1, 2000 through December 31,

20  2000 and showed total costs of $12,547,616, with no non-reimbursable costs.  In a chart listed as

21  "Adjustments to Expenses," NEMS reduced its expenses by $129,280 for outside laboratory,

22  orthodontic, and rental income.  There were no other reductions from the cost report.  The cost report

23  further showed 89,135 FQHC visits, with 89,110 visits identified as reimbursable visits and 25 identified

24  as non-reimbursable orthodontic visits.  By dividing total reimbursable costs by total reimbursable visits,

25  the cost report showed a $140.81 rate per visit.  *Id*.  On November 26, 2001, DHCS issued a letter

26  accepting the data in the cost report.

27      **Clinic FHC71085F.**  On January 12, 2005, NEMS submitted to DHCS a cost report for a third

28  clinic (FHC71085F).  The cost report showed total projected FQHC costs of $1,168,491 for the period

Governments' Trial Brief

1   of January 1, 2006 through December 31, 2006.  On Page 2 of Worksheet 1, NEMS did not identify any

2   non-reimbursable costs.  In a chart listed as "Adjustments to Expenses," NEMS made no reductions to

3   expenses.  The cost report further showed 10,514 FQHC visits, all of which were identified as

4   reimbursable.  By dividing total reimbursable costs by total reimbursable visits, the cost report showed a

5   $111.14 PPS rate per visit.  On September 30, 2010, DHCS issued a letter accepting this data and

6   establishing a PPS rate of $111.14 for Clinic FHC71085F.  *Id*.

7           **B.      SFHP Payments to NEMS**

8           As previously noted, Medi-Cal has contracted with SFHP to provide services to certain Medi-Cal

9   beneficiaries residing in the San Francisco area.  On April 1, 2000, SFHP contracted with NEMS to

10  provide healthcare services to certain Medi-Cal beneficiaries enrolled with SFHP.  The services are

11  described in Exhibit A of the contract.  The contract provided that SFHP would reimburse NEMS

12  through monthly capitation payments, or "per member per month" payments.  The contract defined these

13  capitation payments as the payment amounts set forth in Exhibit B to the contract, which constituted

14  "payment in full for the provision of Medical Group of all Capitated services to Members."  The

15  contract expressly stated that NEMS could not bill or charge any plan enrollee for services and "shall, in

16  no event, … charge, collect a deposit from, seek compensation, remuneration or reimbursement from or

17  have any recourse against Members, an individual responsible for their care, or the State of California

18  (SDHS) for Capitated Services provided pursuant to this Agreement."

19          SFHP made monthly capitation payments to NEMS for Medi-Cal beneficiaries enrolled with

20  SFHP and assigned to NEMS clinics.  Below is a chart reflecting the total capitation payments that

21  NEMS received for SFHP enrollees assigned to NEMS clinics from 2001 through 2008.  SFHP also

22  made monthly capitation payments to NEMS for Medi-Cal beneficiaries enrolled with SFHP and

23  assigned to Family Health Center (FHC), a non-FQHC clinic affiliated with California Pacific Medical

24  Center.  The payments for FHC beneficiaries account for approximately 10 percent of the total capitated

25  payments made to NEMS, and are not included in the totals below:

26

27

28

Governments' Trial Brief
C10-1904 CW                                           7

**Chart 1:  Payments from SFHP to NEMS**
**for Enrollees Assigned to NEMS Clinics (2001-2008)**
**(US $)**

| Year | Total Cap Payments |
|------|-------------------|
| 2001 | $971,553.04 |
| 2002 | $1,309,791.61 |
| 2003 | $1,626,562.03 |
| 2004 | $2,393,931.61 |
| 2005 | $3,256,124.19 |
| 2006 | $3,933,497.91 |
| 2007 | $4,044,443.08 |
| 2008 | $4,196,691.15 |
| **Total** | **$21,732,594.63** |

## C.    NEMS Failed to Report Payments from SFHP

NEMS was required to report the payments it received from all Medi-Cal MCOs on Line 6 of its annual Reconciliation Requests.  Chart 2 identifies the total MCO payments that NEMS reported having received from SFHP and from other MCOs that contracted with Medi-Cal, such as Anthem Blue Cross. On its annual Reconciliation Requests, NEMS did not identify what portion of the reported managed care payments was from SFHP and what portion was from other MCOs.

Governments' Trial Brief
C10-1904 CW                                     8

**Chart 2:  Managed Care Plan Payments Reported by NEMS
on Annual Reconciliation Reports (2001-2008)
(U.S. $)**

| Year | Reported Managed Care Payments |
|------|-------------------------------|
| 2001 | $337,837.00 |
| 2002 | $646,069.00 |
| 2003 | $687,647.00 |
| 2004 | $1,495,160.00 |
| 2005 | $1,958,763.56 |
| 2006 | $2,093,418.80 |
| 2007 | $2,037,708.00 |
| 2008 | $2,374,974.52 |
| **Total** | **$11,631,577.88** |

There is no dispute that NEMS did not report all of the capitated payments it received from SFHP.  Between 2001 and 2008, SFHP reported paying $21,732,594.63 in capitation payments to NEMS, but NEMS reported receiving only $$11,631,577.88 from all MCOs.  Therefore, reviewing the years 2001 through 2008, there is a $10,101,016.75 difference between the managed care revenue from all Medi-Cal managed care plans as reported by NEMS and the payment amounts reported by SFHP.  Chart 3 compares the total amount that NEMS reported receiving in reimbursement from all Medi-Cal MCOs to the amount that SFHP reported as paid to NEMS for the years 2001 through 2008.

Governments' Trial Brief
C10-1904 CW                                        9

**Chart 3:  Comparison of SFHP Payments Received by NEMS
and Managed Care Payments Reported by NEMS
(US$)**

| Year | SFHP Payments | MCO Payments Reported by NEMS | Difference |
|---|---|---|---|
| 2001 | $971,553.04 | $337,837.00 | $633,716.04 |
| 2002 | $1,309,791.61 | $646,069.00 | $663,722.61 |
| 2003 | $1,626,562.03 | $687,647.00 | $938,915.03 |
| 2004 | $2,393,931.61 | $1,495,160.00 | $898,771.61 |
| 2005 | $3,256,124.19 | $1,958,763.56 | $1,297,360.63 |
| 2006 | $3,933,497.91 | $2,093,418.80 | $1,840,079.11 |
| 2007 | $4,044,443.08 | $2,037,708.00 | $2,006,735.08 |
| 2008 | $4,196,691.15 | $2,374,974.52 | $1,821,716.63 |
| **Total** | **$21,732,594.63** | **$11,631,577.88** | **$10,101,016.75** |

NEMS's leadership knew that the instructions required it to report all managed care income on line 6 of its Reconciliation Request.  Wong 141:16-142:14.  However, prior to the current litigation, NEMS never disclosed to DHCS that it was not reporting all of its managed care income on line 6 of the Reconciliation Request.  Wong 110:2-23; 112:25-113:6; 143:25-144:8.  NEMS amassed substantial cash reserves, bought two company cars and multiple buildings, sent employees to retreats in resort locations, and paid bonuses to employees, including a $500,000 bonus to former CEO Sophie Wong.  Deposition of Johnson Wong, 115:6-22; 118:12-25.  Relator Ed Hsu raised NEMS' failure to report all of its managed care income with then CEO Sophie Wong, who fired him shortly thereafter.  ECF 95, Hsu Decl. ¶¶ 3, 6, 9; Trinh Decl. ¶¶ 7, 9.

**IV.    ANALYSIS**

Pursuant to statute and NEMS's status as an FQHC, NEMS was required to report the entire capitated payment it received from SFHP, with very narrow exceptions, to the extent those payments are "reasonable and related" to the cost of providing covered medical services to Medi Cal enrollees.

1    NEMS cannot dispute that it failed to report the entire capitated amount on its Reconciliation Reports for

2    fiscal years 2001 through 2008.  Instead, NEMS has attempted to justify this failure to properly report

3    all managed care income to DHCS using a number of arguments that have evolved over time.  However,

4    none of these arguments is availing.

5    **A.      NEMS Is Not Required To "Pay Itself" The Same Amount It Pays CPMC Clinics.**

6    NEMS initially argued that it was a managed care organization and therefore, pursuant to

7    pursuant to 42 U.S.C. § 1903(m)(2)(A)(ix), was required to "pay itself" exactly what it paid to clinics

8    operated by its business partner, California Pacific Medical Center.  This argument fails for at least two

9    reasons.  First, Section 1903(m)(2)(A)(ix) applies only to MCOs, and NEMS is not a licensed MCO and

10   never contracted with California to provide MCO services.  Rather, Medi-Cal contracted with SFHP to

11   provide MCO services, and SFHP subcontracted with NEMS to provide healthcare services to certain

12   Medi-Cal beneficiaries who enrolled with SFHP.  As a subcontractor, NEMS was obligated to fulfill

13   regulatory requirements that were "appropriate" to the "service or activity" being delegated to NEMS.

14   42 C.F.R. § 438.6(1).  However, the requirement cited by NEMS in section 1903(m)(2)(A)(ix) is not

15   "appropriate" to apply to a subcontractor.  Instead, by its own terms, this requirement governs payments

16   made by an MCO to a subcontracting FQHC - not payments made by the subcontracting FQHC to

17   another healthcare provider and certainly not payments made by the subcontracting FQHC "to itself."

18   Thus, while the requirements in section 1903(m)(2)(A)(ix) apply to SFHP's payments to NEMS, they do

19   not apply to payments by NEMS "to itself" or to another entity.

20   Secondly, even if the requirements in Section 1903(m)(2)(A)(ix) did apply to payments by

21   NEMS "to itself" for medical services, these requirements would not preclude the payment from being a

22   higher amount than that paid by NEMS to other providers.  Section 1903(m)(2)(A)(ix) only requires that

23   payment be "not less than" the amount paid to other providers.  Hence, it would be improper to cite this

24   provision as requiring a particularly low payment amount.

25   **B.      NEMS Never Carved Out Non-FQHC Services From the 2000 Cost Report that
               Formed the Basis of its PPS Rate**

26

27   In its summary judgment briefs, NEMS argued that some of the revenue it received from SFHP

28   was for non clinic activities and therefore did not need to be reported.  Specifically, NEMS argues that it

Governments' Trial Brief
C10-1904 CW                                        11

1  did not report all SFHP capitated payments "because not all of the capitation supported FQHC services."

2  However, any distinction that NEMS attempts to draw between "FQHC services" and non-"FQHC

3  services" is irrelevant because the PPS rate that Medi-Cal paid to NEMS was designed to reimburse

4  NEMS for all the services that it provided, with the limited exception of orthodontic and outside

5  laboratory services.  When establishing its initial PPS rate, NEMS submitted cost reports to the State

6  reflecting total costs of $12,676,896 in fiscal year 2000.  ECF 117, Second Zavala Decl., ¶ 5, Exhs. 26,

7  27.  With the cost reports, NEMS also submitted its audited financial statements for fiscal year 2000,

8  which also reported total costs of $12,676,896.  NEMS made minor adjustments its total costs to carve

9  out two types of medical services: outside laboratory services ($27,973) and orthodontic services ($851),

10  which together amounted to 0.2% of NEMS's total costs.  NEMS then made one additional adjustment

11  for costs associated with rental income ($100,456).  *Id*. After those three adjustments, the total expenses

12  that formed the basis for NEMS's PPS rate were $12,547,616.  *Id*.  NEMS did not carve out any other

13  services from the costs that formed the basis of its PPS rate.  To determine NEMS's PPS rate, Medi-Cal

14  simply divided the total costs (i.e., $12,547,616) by the total number of FQHC visits (89,110).  Thus,

15  NEMS's PPS rate ($140.81) was designed to reimburse NEMS for all its costs aside from laboratory and

16  orthodontic services, including costs that NEMS now identifies as "non-FQHC services."

17  **C.     NEMS's Off-Books Account Provides No Basis For Failing To Report All SFHP**
         **Medi-Cal Capitated Payments.**

18

19  After fact discovery closed and the parties summary judgment motions were fully briefed,

20  NEMS argued for the first time that it paid outside healthcare providers through an off-books bank

21  account that it had concealed from its auditors and never disclosed to DHCS.  In 2003, NEMS made a

22  correction to its audited financial statements to incorporate transactions from the off-books account.

23  However, the 2003 correction did not address any account activity in 2000, and NEMS never amended

24  its 2000 cost report or otherwise notified the state of the off-books account or of the subsequent

25  "adjustment" to its audited financial statements.  Moreover, as the Court recognized, NEMS did not

26  identify any financial records from 2000 reflecting any costs not encompassed by its 2000 audited

27  financial statements or its 2000 cost report:

28

Governments' Trial Brief
C10-1904 CW                                    12

1

2

3

4

> Most importantly, NEMS has not provided any evidence, other than the
> conclusory testimony of a former employee, to show that it actually incurred costs
> in providing specialty services and that the only payments it failed to disclose on
> its reconciliation reports were the SFHP payments intended to cover the costs of
> providing those services.  Nevertheless, NEMS has presented sufficient evidence
> to support an inference that it did not knowingly report false information to
> DHCS on its reconciliation reports.

5

6  ECF 147, at p. 17.  NEMS has not identified a single exhibit to be introduced at trial that documents any

7  payment to any outside providers in 2000.  NEMS's expert testified that he had no basis for concluding

8  that NEMS incurred any expenses in 2000 that were not reflected in its audited financial statements.

9  Thus, NEMS has no basis for arguing that any payment it received from SFHP could be allocated to

10 services that were not encompassed by the PPS rate based on its 2000 cost report.

11 **V.     DAMAGES**

12      Under the FCA and CFCA, the Governments are entitled to recover all damages incurred

13 "because of" the false claims at issue in this case. The term "because of" simply means those damages

14 that were caused by, or would not have occurred but for, the false claims and false statements.  *United*

15 *States v. First Nat'l Bank of Cicero*, 957 F.2d 1362, 1374 (7th Cir. 1992).  The measure of damages the

16 Governments are entitled to recover under the FCA and CFCA is the amount of money the Governments

17 paid out by reason of the false claims over and above what it would have paid out if the claims had not

18 been false or fraudulent.  *Ambassador Hotel Co., Ltd. v. Wei-Chuan Investment*, 189 F.3d 1017, 1032-33

19 (9th Cir. 1999).  In this case, the Governments' damages are the difference between the amount of

20 managed care income that NEMS received from SFHP for Medi-Cal beneficiaries assigned to NEMS

21 and the amount that NEMS actually reported on its year-end Reconciliation Requests.

22      Medi-Cal is a payor of last resort.  As a result, the amount that Medi-Cal owes to an FQHC is

23 directly offset, dollar-for-dollar, by payments the FQHC receives from third parties, such as Medi-Cal

24 managed care plans.  Thus, in this case, the $10,101,016.75that NEMS received from SFHP for Medi-

25 Cal beneficiaries assigned to NEMS, but that NEMS failed to report on its annual Reconciliation

26 Requests would have been a direct offset to the amount that Medi-Cal was obligated to reimburse

27 NEMS so that it received its PPS rate for each of the Medi-Cal managed care visits. As a result, the

28

1   Governments' damages are the amount by which NEMS underreported the payments it received from

2   SFHP, or $10,101,016.75.

3        The FCA provides for treble damages and a civil penalty of $5,000 to $10,000 for each false

4   claim submitted.  See 31 U.S.C. § 3729(a).  False claims submitted after September 29, 1999 incur a

5   penalty of between $5,500 and $11,000 per claim.  *See* 28 C.F.R. § 85.  The court assesses the penalties

6   and applies the treble damages multiplier.  *See United States ex rel. Chandler v. Cook County*, 538 U.S.

7   119, 123 (2003) ("[U]nder the FCA, if [the jury] finds liability, its instruction is to return a verdict for

8   actual damages, for which the court alone then determines any multiplier, just as the court alone sets any

9   separate penalty.").  The imposition of penalties is mandatory.  *See United States v. Hughes*, 585 F.2d

10  284, 286 (7th Cir. 1978).

11       In this case, the Governments are entitled to treble damages, or $30,303,050.25.  In addition to

12  treble damages, the Government parties are entitled to penalties of between $5,500 and $11,000 for each

13  false claim.  Each Reconciliation Requests submitted by NEMS for fiscal years 2001 through 2008 was

14  a false claim.  NEMS submitted a total of twelve false Reconciliation Requests to DHCS: eight

15  Reconciliation Requests for the clinics FHC11007F and FHC70714G for fiscal years 2001 through 2008

16  and four Reconciliation Requests for Clinic FHC71085F for fiscal years 2005 through 2008.

17       In the alternative, the Governments are entitled to recover their single damages pursuant to their

18  common law unjust enrichment claims.

19                                        Respectfully submitted,

20                                        JOYCE R. BRANDA
                                          Acting Assistant Attorney General
21

22                                        MELINDA HAAG
                                          United States Attorney
23

24  Dated: January 7, 2015        By:    _____/s/_____
                                          MELANIE L. PROCTOR (CABN 228971)
25                                        ILA C. DEISS (NYBN 3052909)
                                          Assistant United States Attorneys
26                                             450 Golden Gate Avenue, Box 36055
                                               San Francisco, California 94102
27                                             Telephone: (415) 436-6730 (Proctor)
                                               melanie.proctor@usdoj.gov
28

Governments' Trial Brief
C10-1904 CW                              14

1   Dated: January 7, 2015                      By:        _____/s/_____
                                                            MICHAEL D. GRANSTON
2                                                           DANIEL R. ANDERSON
                                                            EDWARD C. CROOKE
3                                                           Civil Division, U.S. Department of Justice
                                                            Attorneys, Civil Division
4                                                           United States Department of Justice
                                                                Ben Franklin Station, Box 261
5                                                               Washington, D.C. 20044
                                                                Telephone: (202) 353-0426
6                                                               edward.crooke@usdoj.gov
7
                                                            Attorneys for the United States
8
9                                                           KAMALA D. HARRIS
                                                            Attorney General for the State of California
10

11
     Dated: January 7, 2015                      By:        /s/David Songco_____
12                                                          DAVID SONGCO (CABN 164296)
                                                            Deputy Attorney General
13                                                          California Attorney General's Office
                                                            Bureau of Medi-Cal Fraud and Elder Abuse
14                                                              1455 Frazee Road, Suite 315
                                                                San Diego, CA  92108
15                                                              Telephone:  (619) 688-6633
                                                                David.Songco@doj.ca.gov
16                                                          Attorneys for the State of California
17

18

19

20

21

22

23

24

25

26

27

28

Governments' Trial Brief
C10-1904 CW                                                 15