UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT

Northern District of California

San Francisco Division

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF CALIFORNIA, *ex rel.* TRINH and HSU, | No. 10-cv-1904 CW (LB) |
| Plaintiffs, | **ORDER ENFORCING SETTLEMENT** |
| v. | [Re: ECF No. 189] |
| NORTH EAST MEDICAL SERVICES, INC., | |
| Defendant. | |
| NORTH EAST MEDICAL SERVICES, INC., | No. 12-cv-2895 CW (LB) |
| Plaintiff, | |
| v. | [Re: ECF No. 112] |
| CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES, *et al.*, | |
| Defendants. | |

**INTRODUCTION**

The United States and the state of California move to enforce an oral settlement in the captioned cases that the parties reached in open court. The parties were unable to then reduce that settlement to writing. The issue is whether the parties' oral settlement agreement is enforceable, which turns on whether there was an unfulfilled condition precedent to the agreement that the defendant receive a "comprehensive release" of "any and all [federal] administrative claims or actions"? NEMS argues

ORDER (C 10-1904 CW (LB); C 12-2895 CW (LB))

that the condition was not satisfied and that there thus is no agreement.

The court retained jurisdiction when the parties put their agreement on the record, and the parties also consented separately to the undersigned's jurisdiction to hear the motion to enforce. (*See* ECF No. 189-11 at 11 & 14; ECF No. 220.)[1] For the reasons stated below, the court finds that the parties' settlement agreement is enforceable on the terms previously put into the record. It accordingly grants the plaintiffs' motion.

## STATEMENT

### I. BACKGROUND

The relators commenced a *qui tam* action against North East Medical Services, Inc. ("NEMS") in 2010 (case 10-1904), alleging, among other things, that NEMS knowingly underreported revenue that it received from Medi-Cal managed-care plans in order to artificially inflate supplemental payments it received directly from Medi-Cal. (ECF No. 1.) The federal and California governments investigated these allegations, intervened in the *qui tam* action, and filed an Amended Complaint in intervention. (ECF Nos. 17, 25, 26.)  For its part, NEMS has filed two separate lawsuits against California (cases 10-2433 and 12-2895) alleging that aspects of the State's process for reimbursing federally qualified healthcare clinics violate federal law. The court related the three actions, and case 12-2895 was slated for trial along with the *qui tam* case (10-1904). The court later granted summary judgment for the state defendants in 10-2433. NEMS filed a notice of appeal in the 10-2433 case.

### II. THE SETTLEMENT

On August 28, 2014, the parties engaged in settlement negotiations mediated by the undersigned. (ECF No. 166.)  In these discussions NEMS was represented by its counsel and by its CEO, Eddie Chan. The parties reached an agreement in principle to resolve all three cases. Mr. Chan stated that he would convene NEMS's board of directors that evening to obtain authority for the settlement agreement. The following day, NEMS notified the plaintiffs and the court that the Board had approved the agreement in principle. On September 3, 2014, the court held a telephone conference

---

[1] Record citations are to documents in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents. For ease of reference, all citations are to material filed in case 10-1904.

with the parties to discuss the contours of the settlement agreement. (ECF 169.)

On September 4, 2014, the parties and their counsel settled the cases and entered the settlement agreements on the record. (ECF Nos. 170, 189-1 (transcript).) The parties and counsel who were present with settlement authority were as follows:

<u>10-1904 and 10-2895 Cases</u>

For the United States:   Ila Deiss and Melanie Proctor from the U.S. Attorney's Office, Meredith Tool from the U.S. Department of Justice (*id.* at 5).

For the state of California:  David Songco, Deputy Attorney General (*id.* at 8).

Relator:   James Diamond, attorney for relators (*id.* at 9).

NEMS:   James Feldesman, Matthew Freedus, and Marissa Guevara (counsel); Eddie Chan, CEO, NEMS (*id.* at 3).

<u>10-2433 (Medicare Part D) Case</u>

State of California:   Joshua Sondheimer (California DHCS) and Hadara Stanton, Deputy Attorney General (*id.* at 10).

NEMS:   same as in previous section

**A. The Settlement Terms For the 10-1904 and 10-2895 Case**s

1. A monetary payment by NEMS, for an amount kept confidential here, including 2.37% interest from September 26, 2014. (ECF No. 189-1 at 11.)

2. The court would retain jurisdiction over the settlement agreement notwithstanding subsequent dismissals. (*Id.*)  The court also noted that it was "retaining . . . jurisdiction over the settlement agreement to give everybody some comfort about the orderly process of this [meaning, the process described in the transcript for the points that follow] . . . ."  (*Id.* at 11, 14.)

3. The settlement was contingent on NEMS's "resolution of its federal administrative remedies [essentially, whether or not the U.S. Department of Health and Human Services ("HHS") would require a corporate-integrity agreement ("CIA")] with Nancy Brown at HHS, a process that the parties anticipate will take a couple of weeks." (*Id.* at 11.)

4. NEMS and the California Department of Health Care Services ("DCHS") agreed to implement an auditing process, including auditors for both sides, to establish governing standards on how NEMS reports revenue for wraparound purposes for open and future years. (*Id.* at 11-12.)

5. The agreement would be reduced to writing, and that final settlement agreement would require

approval by the government parties' respective governing bodies: Main Justice and the U.S. Attorney's Office for the federal government, and the ordinary approval process for the State's settlement agreements. (*Id.* at 12.)

   6. The settlement agreement in the *qui tam* case (10-1904) would be a standard False Claims Act settlement agreement. (*Id.* at 12.)  NEMS was "aware of that settlement agreement and its release statement [] and the extent of the release."  (*Id.*)

   7. The settlement would not address the relators' attorney's fees or any of the relators' non-intervened claims. (*Id.* at 12-13.)  The contemplation was that those issues would be the "subject of a separate negotiation . . . [with] the hope that it will be [finalized in the same time line that we have allocated to the finalizing of the federal administrative remedies [with Nancy Brown]." (*Id.*)

   8. Cases 10-1904 and 12-2895 case would be dismissed with prejudice. (*Id.* at 13.)

   9. Because the scope of the settlement of the 10-1904 case covered only years 2001 to 2008, the United States Attorney would provide a "cold comfort letter" to NEMS in the 10-1904 case to cover the years 2009-2010, and with respect to those years, the dismissal would be without prejudice. (*Id.* at 13-14.)

   The court stated on the record that these settlement terms would be in return for dismissal of the 10-1904 and 10-2895 cases with prejudice (again subject to the approval of the settlement agreement by the governing bodies for the federal and state agencies involved). (*Id.* at 13.)  The court asked NEMS's attorney whether it had recited the all the terms of the settlement agreement as to the 10-1904 and 10-2895 cases. (*Id.* at 14.)  NEMS' counsel asked for 30 seconds "just to make certain we covered all the points we wanted to."  (*Id.* at 14.)  After that short break, counsel responded, "Judge, we're ― we're good with it."  (*Id.* at 15.)  At the government's request, the court stated the usual process, which is that the United States would file the dismissal only after it was paid the settlement amount. (*Id.* at 16.) The court then asked the attorneys for the United States and the state of California whether the court had missed any terms, and counsel for both replied that the court had not. (*Id.* at 17, 25.)

ORDER (C 10-1904 CW (LB); C 12-2895 CW (LB))        4

**B. The Settlement Terms For the 10-1243 Case**

The parties agreed to maintain the status quo in case 10-2433 (including working in good faith to implement a process to do that by, e.g., filing a protective notice of appeal if necessary and thereafter staying the case); "if the audit process [described in number 4 in the previous section] . . . is resolved, then the agreement is that NEMS would dismiss its appeal and essentially . . . dismiss the case entirely." (*Id. at* 13,17-18.)  The court recited that term on the record and asked counsel for NEMS and the State of California whether it had recited the terms accurately. (*Id.*)

**C. Acceptance Of Terms On the Record**

The court then asked the parties with settlement authority whether they accepted the terms of the settlement agreements, and they said that they did.

THE COURT: And so from – let me turn, first, to Mr. Chan.

Do you understand the terms of the settlement that I have just described for you?

MR. CHAN: Yes, I do, Your Honor.

THE COURT: Do you understand that if you accept the terms, it ends all the cases in the way we have described and you can't reopen them?

MR. CHAN: Yes, I do, Your Honor.

THE COURT: Do you accept the terms of the settlement agreement?

MR. CHAN: Yes, I do, Your Honor.

(*Id.* at 19.)

The court then asked the federal government (party only to the *qui tam* False Claims Act 10-1904 case) whether it accepted the settlement agreement, and it said that it did (subject to the ordinary final supervisory authority). (*Id.* at 16-17.)  Then, the court asked the state of California whether it accepted the settlement agreements in all cases, and it said that it did (again subject to the ordinary final supervisory authority that is required in any state settlement agreement). (*Id.* at 17, 25.)

Relator's counsel similarly accepted the terms of the 10-1904 settlement agreement (and represented that he had authority to do so on behalf of his clients) with the caveat that the issue of attorney's fees were not part of the settlement and remained to be negotiated. (*Id.* at 9, 21.)  The

court noted that it remained available to help with that process, and it was essentially a carve-out that does not affect settlement or dismissal of the case. (*Id.* at 22.) NEMS and Mr. Chan agreed to that process too. (*Id.* at 23.)

Then, the state asked, and NEMS (including Mr. Chan) agreed that the court would retain jurisdiction through January 1, 2016 "to work out any issues with the audit process." (*Id.* at 25.)

The court concluded by saying, "So that's everything, everybody. So we've got the essential terms of the settlement . . . agreement on the record. . . . I'll tell [Judge Wilken] that the case settled and that I expect the dismissal papers to be submitted within 30 to 45 days given the exercise of due diligence." (*Id.* at 25-26.)

**D. Subsequent Events Regarding the Contingencies**

The settlement was subject to two contingencies.

First, as already mentioned, the United States and the State of California had to obtain approval from their respective supervisory authorities. This is standard in settlements involving government bodies, essentially requires sign-off by the powers that be on the final settlement agreement, and is not an issue in the current motion. At the January 8, 2015 hearing, the federal and state governments represented that they had the authority to sign the transcripts. Thus, no one disputes that the contingency of approval was satisfied (and the court in any event found at the January 8, 2015 hearing that the contingency of final agency approval was satisfied).

Second, NEMS would resolve its administrative issues with HHS. Again, in putting the settlement on the record, the court said: "[T]he settlement . . . is contingent on NEMS's resolution of its federal administrative remedies with Nancy Brown at HHS, a process that the parties anticipate will take a couple of weeks . . . ." (ECF No. 189-1 at 11; *see also id.* at 15-16.) Subsequently, the federal government informed NEMS "that so long as it participated in the state audit process set forth in the settlement agreement, it could satisfy the requirements for a corporate integrity agreement with the Office of the Inspector General of the Department of Health and Human Services." (Proctor Decl., ECF No. 189-1 at 2, ¶ 9.) At the hearing, NEMS said that it would participate in an audit process if the court found the settlement agreement enforceable, and it did not dispute (in its papers or at the hearing) that it agreed to participate in this process. As discussed

ORDER (C 10-1904 CW (LB); C 12-2895 CW (LB))   6

below, at the January 8, 2015, hearing, the government represented that HHS would not require a corporate-integrity agreement.

### III. AFTER THE SETTLEMENT

The parties could not reduce their agreement to writing. In the weeks that followed, the government plaintiffs provided NEMS with a draft settlement agreement. That draft contained the terms to which the parties had agreed on the record. It was built on the form of a standard False Claims Act settlement agreement. (*See* ECF No. 189-1 at 29-65 (draft and earlier NEMS settlement agreements).)  NEMS refused to sign it. The parties' accounts here diverge.

The government plaintiffs view NEMS's refusal to sign the written settlement as reneging on its agreement and trying to extract additional concessions. "Among other demands," the governments write, "NEMS has sought to remove provisions for a future auditing process, dismissal of Cases 10-2433 and 12-2895, and interest on the settlement amount." (ECF No. 189 at 5.)  Furthermore, according to the governments, NEMS wants to restructure the entire agreement to remove basic terms appearing in all [False Claims Act] settlement agreements." (*Id.*)  They also argue that the administrative-claims condition has been "resolved." (*Id.*)  They state that HHS told NEMS that, so long as it participated in the audit process that the settlement agreement contemplates, it would satisfy HHS's requirement of a "corporate integrity agreement." (*Id.*)  "Corporate-integrity agreements" are the usual vehicle by which the HHS settles false-claims matters.

NEMS sees things differently. Most centrally, NEMS denies that the administrative-claims issue was resolved. In NEMS's view, it did not receive a "comprehensive release from HHS," and thus it may still face "administrative claims and actions." (*E.g.*, ECF No. 195 at 3, 6.)  It fears exclusion or debarment that could jeopardize its existence. (*Id.* at 3.)  Its operations depend on continued participation in Medicaid and receipt of its section 330 grant. (*Id.*)  NEMS explains that it contacted HHS soon after the last settlement conference (where the agreement was put on the record) to discuss resolving administrative claims. (*Id.* at 6.)  According to NEMS, HHS "suggested that the 'state audit process' term of the tentative agreement . . . *might* resolve HHS's concerns as to what if any administrative remedies might be appropriate. But [HHS] wanted to know more about the [audit] process before discussing the matter further with NEMS." (*Id.* (emphasis by NEMS).)  The

parties later met to discuss the audit process. By now, according to NEMS, they were at loggerheads. On its side, NEMS believed that a completed audit, or at least an agreed-upon audit process, which would allow HHS to guarantee a "comprehensive release" from "any and all administrative claims," was a "prerequisite" to NEMS's signing the final settlement agreement. (*Id.* at 6-11.) But without a signed final settlement, NEMS says, the governments "would only provide a general outline of [their] proposal" for the audit process. (*Id.* at 7.) The parties disagreed over how the audit should work. (*Id.* at 8-10.) In its opposition brief here, NEMS identifies a "number of concerns" that it had with the proposed audit. (*Id.* at 8-10.) The parties met again on October 7, 2014, to work on their differences over the audit process. But, writes NEMS, the negotiations "completely broke down." (*Id.* at 11.)

The court met with the parties several times after it put the settlement agreement on the record to try to work out NEMS's concerns with the final form of the written settlement agreement. (*See* ECF Nos. 171, 174, 183, 184, 185, 186, 188, 193, 197, 198.)

**IV. THE JANUARY 8, 2015 HEARING**

The court held a hearing on January 8, 2015. (ECF No. 219.) At the hearing, the parties consented to the court's jurisdiction over the motion to enforce the settlement agreement. (*See* ECF No. 220.) At the hearing, the government did not dispute that the parties' agreement – that NEMS and the State of California would implement an auditing process to establish governing standards on how NEMS reports revenue for open and future years – means that HHS will not require a corporate- integrity agreement. The court made the finding that the parties' agreement and NEMS's participation in the audit process described above means that HHS cannot require a CIA.

## ANALYSIS

The parties do not dispute that the resolution of NEMS's administrative remedies was a contingency that needed to be satisfied for the settlement to be binding. The parties disagree about whether it required (as the government asserts) only HHS's agreement that it would waive its usual corporate-integrity agreement because NEMS agreed to participate in an audit process with the state, or whether (as NEMS asserts) it required a "comprehensive release" of "all administrative claims or actions." A second issue is whether (as NEMS asserts) the settlement promised NEMS a particular

audit process that not only specified the governing standards but also allowed NEMS to remain in business, or whether (as the government asserts) it commits the parties only to undertaking some audit process.

## I. GOVERNING LAW

The legal rules governing settlement agreements are straightforward; the parties do not disagree over them. "This Court has the inherent power summarily to enforce a settlement agreement involving an action pending before it." *Brionez v. U.S. Dep't of Agric.*, 2007 WL 217680, at *2 (N.D. Cal. Jan. 26, 2007) (Wilken, J.) (citing *In re Suchy*, 786 F.2d 900, 902-903 (9th Cir. 1985)). This power extends to oral agreements reached in open court. *Doe v. Halekulani Corp.*, 276 F.3d 1131, 1138 (9th Cir. 2002). "The interpretation and enforcement of a settlement agreement is governed by the legal principles applicable to contracts." *Brionez*, 2007 WL 217608, at *2 (citing *United Commercial Ins. Serv. Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992)). Furthermore, "a settlement agreement is governed by principles of state contract law . . . even where a federal cause of action is 'settled.'" *Id.* (quoting *Botefur v. City of Eagle Point, Or.*, 7 F.3d 152, 156 (9th Cir. 1993)). California contract law thus governs whether the parties entered into an enforceable agreement. *Wilcox v. Arpaio*, 753 F.3d 872, 876 (9th Cir. 2014).

"An essential element of any contract is 'consent'" to ― or, as NEMS equally well calls it here, a "meeting of the minds" on ― the agreement's material terms. *E.g.*, *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 810-14 (1998). To be enforced, a settlement must also meet two specific requirements: (1) it must be a complete agreement; and (2) the settling parties must have either agreed to the terms of the settlement or authorized their respective counsel to settle the dispute. *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987); *Harrop v. W. Airlines, Inc.*, 550 F.2d 1143, 1144-45 (9th Cir. 1977); *Hamilton v. Willms*, 2007 WL 707518, at *9 (E.D. Cal. Mar. 6, 2007). "Under California law," moreover, "the intent of the parties determines the meaning of the contract." *United Commercial*, 962 F.2d at 856 (citing Cal. Civ. Code §§ 1636, 1638). "The relevant intent is 'objective' — that is, the intent manifested in the agreement and by surrounding conduct — rather than the subjective beliefs of the parties." *United Commercial*, 962 F.2d at 856. Therefore, if a party does not express its true intent as to the meaning of a material term of a settlement agreement, that

subjective intent is "irrelevant." *See id*.

When parties intend that an agreement be binding, the fact that a more formal agreement must be prepared and executed does not alter the validity of the agreement. *Blix St. Records, Inc. v. Cassidy*, 119 Cal. Rptr. 3d 574, 582 (2010); *see also EEOC v. Hosp. Housekeeping Sys. of Houston, Inc.*, 2013 WL 5817726, at *3 (E.D. Cal. Oct. 29, 2013). An in-court settlement is thus binding "even though it is contemplated that the terms will thereafter be reduced to a signed writing." W. Schwarzer *et al.*, *Federal Civil Procedure Before Trial* ¶ 15:136 (The Rutter Group 2014). Furthermore, where an oral settlement is otherwise enforceable, a party's "later refusal to sign the written agreement does not invalidate the settlement." *See* Schwarzer, *supra*, ¶ 15:136.1 (citing *Moore v. Beaufort County*, 936 F.2d 159, 163 (4th Cir. 1991)).

## II. APPLICATION

### A. The Parties' Positions

The governments' position may be reduced to two salient contentions. First, they argue that the administrative-claims condition "was resolved." (*E.g.*, ECF No. 189 at 2, 5; ECF No. 199 at 3-4.) Specifically, according to the governments, this resolution occurred when HHS told NEMS that "it could satisfy the need for a corporate integrity agreement by engaging in the DHCS audit process." (ECF No. 199 at 4.) Second, the governments argue that NEMS did not agree to settle only for a "completed" audit process, or a particular result; rather, NEMS agreed to engage in an "audit process." (*Id.* at 4.)

Most centrally, NEMS denies that the administrative-claims condition has been met. In NEMS's view, again, it was a "condition precedent" to the settlement agreement's becoming enforceable that the HHS "resolution" entail a "comprehensive release" of "any and all administrative claims or actions." (*See, e.g.,* ECF No. 195 at 3, 6.) Without that release, NEMS argues, there is "no settlement agreement." (*Id.* at 6.) That release, whatever its scope, depended on NEMS engaging in the audit process to which it had committed itself. But the parties could not agree on an audit process in the weeks that followed their agreement — at least partly over the "concerns" that NEMS details in its opposition brief. (*See* ECF No. 195 at 8-10.)

### B. Analysis under the Applicable Case Law

### 1. Conditions precedent and objective intent

"Conditions precedent are not favored and contractual provisions will not be so construed in the absence of language plainly requiring such a construction." *In re Marriage of Hasso*, 229 Cal. App. 3d 1174, 1181 (1991); *accord, e.g., Frankel v. Bd. of Dental Examiners*, 46 Cal .App. 4th 534, 550 (1996) (citing *Rubin v. Fuchs*, 1 Cal. 3d 50, 53 (1969)). Consequently, "courts shall not construe a term of the [given] contract to establish a condition precedent absent plain and unambiguous contract language to that effect." *Frankel*, 46 Cal. App. 4th at 550. "[A]n agreement will [thus] be strictly construed against a party asserting that its provisions impose a condition precedent." *Helzel v. Superior Ct.*, 123 Cal. App. 3d 652, 663 (1981).

"Under California law," moreover, "the intent of the parties determines the meaning of the contract." *United Commercial*, 962 F.2d at 856 (citing Cal. Civ. Code §§ 1636, 1638). "The relevant intent is 'objective' — that is, the intent manifested in the agreement and by surrounding conduct — rather than the subjective beliefs of the parties." *United Commercial*, 962 F.2d at 856. Therefore, if a party does not express its true intent as to the meaning of a material term of a settlement agreement, that subjective intent is "irrelevant." *See id.*

### 2. Posdata

Both parties discuss *Posdata Co. v. Kim*, No. 07-2504, 2008 WL 1422418 (N.D. Cal. Jan. 14, 2008). In that case, as NEMS correctly writes, "the court denied a motion to enforce a settlement agreement even in the face of the parties having placed settlement terms on the record." (ECF No. 195 at 15 (citing *Posdata*).) The *Posdata* court refused to enforce a settlement that it found "tentative" and which was subject to "at least two contingencies." *Posdata, supra*, at *4-*5. "Based on the record alone," the *Posdata* court was "convinced that the terms of the settlement between the parties were not intended to be final or binding." *Id.* at *5.

The court agrees, however, with the government's reading of *Posdata*. The settlement agreement in that case was tentative in a way that the present agreement was not. The *Posdata* parties expressly said that the agreement they were putting on the record was only a "proposed" or "tentative settlement." *Id.* at *1-*2. (They said this *before* reciting the terms of the "proposed agreement." *Id*. That is quite different from characterizing an agreement as "tentative" only in retrospect, which is

what NEMS does.) Their agreement was "tentative" partly because of the outstanding "contingencies." *See id.* at *1-*5. The *Posdata* court could therefore find that "[t]he record strongly suggests that the settlement was not intended to be final." *Id.* at *5.

The same is not true here. The parties in this case did not qualify their agreement as only "proposed" or "tentative." They simply asserted that they agreed to the settlement's terms to resolve their dispute. They objectively manifested no intent to merely "propose" a settlement and instead, resolved their case subject to the contingency of resolving their administrative remedies with Nancy Brown at HHS. If *Posdata* is helpful here, it is by showing by contrast the "plain" and "unambiguous" *pre*-settlement language that may upend a putatively final agreement. That language, again, is absent here.

### 3. Core-Vent

The court finds instructive the patent-infringement decision in *Core-Vent Corp. v. Implant Innovations, Inc.*, 53 F.3d 1252 (Fed. Cir. 1995). The appellate court in *Core-Vent* enforced a settlement to which the parties had agreed in open court, even though the parties could not later agree to the terms of a license that the settlement mandated. *Id.* at 1253-58. *Core-Vent* shows that a settlement agreement is enforceable where parties expressly agree to its core terms, even if one of those terms (like the "resolution" of NEMS's administrative concerns) leaves something further to be worked out.

The operative elements of *Core-Vent* share much with this dispute. In the courtroom, just before their trial was to start, the *Core-Vent* parties announced that they had reached a settlement agreement. *Id.* at 1254. The court directed the plaintiff's lawyer to read the agreement's terms into the record. *Id*. The terms were equivalent in their level of detail to the terms that this court read into the record here. *Compare id.* at 1254 *with* (ECF No. 189-1 at 11-14). Among other things, the *Core-Vent* plaintiff agreed to grant the defendant "a non-exclusive worldwide license" to the challenged patent and its "foreign counterparts." *Id.* at 1254. Much like the audit process in this case, the terms of the patent license in *Core-Vent* were not spelled out as part of the in-court settlement. *See id*. The *Core-Vent* court asked both parties whether they accepted the terms and both said that they did. *Id.* at 1254-55.

The parties proved unable to agree to the license's terms. *Id.* at 1255. The district court entered judgment nonetheless on the terms as they had been read into the record and the defendant appealed. *Id.* at 1253, 1255. The *Core-Vent* defendant challenged the settlement with almost exactly the same arguments that NEMS makes here. Because the parties could not agree to the license's terms, the defendant argued, there had been no "meeting of the minds" on a matter "integral" to the settlement. *Id.* at 1255. A "complete settlement" had therefore "not yet been reached." *Id.* at 1255. The in-court agreement, in the *Core-Vent* defendant's view, could not be enforced.

The Federal Circuit disagreed and affirmed the judgment on the settlement. The appellate court wrote:

> The record establishes beyond question that after the hearing at which [the plaintiff's lawyer] stated the detailed terms of the settlement, the parties, their attorneys and the court understood and agreed that the case was settled on those terms. The presidents of both companies answered affirmatively to the court's question whether the terms [that the plaintiff's lawyer] had stated were "an acceptable settlement to conclude this case."

*Id*. The court also rejected an argument identical to the one NEMS makes here. The *Core-Vent* defendant insisted that it had understood that the settlement contemplated that the parties would go on to negotiate specific terms of the license — and, much like NEMS, it identified particular "material" terms that would have to be worked out and on which post-settlement discussions had stumbled. *Id.* at 1256; *compare* (ECF No. 195 at 8-10). Had eventual resolution of these particulars not been part of the agreement, the defendant urged, it "would not have indicated [its] assent to the core terms of the parties' settlement read in open court." *Id*. The *Core-Vent* court answered: ""If that was [*Core-Vent's*] understanding of the settlement, [it] should have indicated" that understanding. *Id.* "Instead, [it] accepted the settlement without equivocation." *Id*. The defendant's private understanding did not prevent an enforceable agreement from being formed. "Since contractual obligations are to be ascertained from objective manifestations of intent, [the defendant's] mental reservations are legally irrelevant." *Id.*

This case is not significantly different. The same result should follow. The parties agreed on the record to the settlement's core terms. They agreed, more specifically, to work through an audit process and that NEMS would "resolve" administrative issues with Nancy Brown at HHS. They did not make enforceability of the settlement dependent on a particular outcome of the audit and instead

ORDER (C 10-1904 CW (LB); C 12-2895 CW (LB))    13

agreed to engage in a process to resolve the issues by audit.

Moreover, the court rejects NEMS's argument that it bargained for a comprehensive release by entering into the contingency that it would resolve "its federal administrative remedies with Nancy Brown at HHS." The issue was only whether Ms. Brown at HHS would require, or waive, a corporate-integrity agreement. NEMS wanted waiver, and it got it. NEMS cannot elaborate its desires now for a more comprehensive release to block the existence of a now-complete and enforceable settlement agreement. If NEMS had wanted to include more precise, or different, conditions into the settlement, it should have expressed that desire openly, objectively. California law does not permit it to now claim a particular subjective understanding that is not "plainly and unambiguously" captured in the terms to which it assented.

### 4. *Lynch* — *The court's recollection*

The court's understanding of the parties' agreement also plays a role. For example, even where no agreement is written down or put on the record, the court's recollection of the parties' agreement can alone support an enforceable settlement. *Lynch, Inc. v. SamataMason, Inc.*, 279 F.3d 487, 489-90 (7th Cir. 2002) (cited in Schwarzer, *supra*, ¶ 15:145.1).

Here, the court's enforcement of the plain terms of the settlement agreement means that its understanding of those terms plays a role in construing what they mean. The settlement negotiations resulted in an agreement on the record that committed the parties to an audit process with the state that would resolve the open and future years. The agreement was not that the audit process would be completely agreed upon — or there would be no settlement. The parties and the court even contemplated that NEMS might not ultimately agree with the outcome of the audit and that NEMS might appeal aspects of the process along the way. But, whatever the process and whatever the result, that process would itself yield the administrative clarity that NEMS has always said, and still says, was one of its prime objectives. (*See* ECF No. 195 at 3 n. 1.) That clarity was not to follow from some particular audit process being forged *before* the settlement became enforceable. Rather, the enforceable settlement agreement committed the parties to engaging in an audit process.

Similarly, the agreement was not that HHS would issue a "comprehensive release" of "any and all administrative claims or actions" — or there would be no settlement. The term "resolving federal

administrative remedies with Nancy Brown at HHS" included the words "Nancy Brown" to show what the parties meant. Nancy Brown is the person who gives a thumbs up or a thumbs down to the need for a corporate-integrity agreement. The court and the parties know this from this and other similar cases, and that was the only issue regarding the federal administrative remedies addressed in the parties' agreement on the record. NEMS's subsequent attempts to broaden its administrative release with the federal government does not change this outcome.

It is true – as the parties discussed on the record on January 8, 2015 – that after its September 4 agreement on the record, NEMS became nervous that the Health Resources and Services Administration (HRSA) might try to exclude or bar NEMS based on the source of its funds used to pay the monetary component of the settlement. NEMS then attempted to negotiate a broader release to address this concern. That does not change the outcome that only Nancy Brown's CIA decision was a contingency, and the court finds that contingency was satisfied. (Technically, the contingency was that NEMS would "resolve" its remedies. And Nancy Brown could have required a CIA, which perhaps NEMS could have argued was different from a resolution. But "no CIA" was the best that NEMS could accomplish, and NEMS received that outcome, thereby necessarily resolving its remedies with Ms. Brown at HHS. Moreover, to the extent that NEMS argues that Nancy Brown said only that she "might" waive the CIA, the government clarified this issue on the record on January 8, 2015. To remove any doubt, and based on its understanding of the terms, the court finds that the government's representations means that HHS cannot require a CIA so long as NEMS engages in the audit process as part of the settlement of the cases in 10-1904 and 12-2895.)

That being said, while NEMS's attempt to broaden the release does not alter what it agreed to on the record on September 4, 2014, the court held subsequent mediated discussions with the parties to try to work out the written settlement agreement and to address NEMS's fears about exclusion. As discussed at the hearing on January 8, 2015, at the court's and NEMS's counsel's request, the United States Attorney's office talked to HRSA and thereafter represented to the court and NEMS that HRSA was aware of the settlement agreement, the source of the funds, and NEMS's concerns, and it did not object to the settlement agreement. The undersigned's retention of jurisdiction over the settlement agreement provides NEMS a mechanism for raising any concerns going forward.

ORDER (C 10-1904 CW (LB); C 12-2895 CW (LB))           15

Again, California law does "not favor[]" conditions precedent. *Hasso*, 229 Cal. App. 3d at 1181. Such conditions arise only from "plain and unambiguous" language. *Frankel*, 46 Cal. App. 4th at 550. And courts must "strictly construe" agreements against finding such conditions. *Helzel*, 123 Cal. App. 3d at 663. Finally, a contract's meaning is gleaned from the parties' "objective" manifestations of intent — from the agreement itself and the surrounding conduct — not from their unexpressed beliefs, desires, or qualifications. *United Commercial*, 962 F.2d at 856. If NEMS "anticipated that it would secure" a "comprehensive release" of "any and all [federal] administrative claims or actions" as a "condition precedent" to the creation of a binding settlement agreement (*see, e.g.,* ECF No. 195 at 4), then it was bound to make that understanding, that intent, "plain and unambiguous" on the record. Like the defendant in *Core-Vent*, NEMS instead accepted the stated terms of the settlement "without equivocation." It cannot now undo that agreement by claiming that it meant to accede only to a more expansive and more richly detailed settlement than the one to which it openly consented.

Also, to the extent that NEMS argues that it did not agree to a False Claims Act settlement and agreed only to a "restitution" settlement, the court rejects that argument. NEMS said explicitly that it agreed to the standard False Claims Act settlement agreement. (ECF No. 189-1 at 12.) It was "aware of that settlement agreement and its release statement . . . and the extent of the release." (*Id.*) Indeed, NEMS knew what a False Claims Act settlement was because it entered into a written False Claims Act settlement agreement in 2008 in *NEMS I*. (*See NEMS I* Settlement Agreement, ECF No. 189-1 at 45-65.) NEMS did not (and could not) argue to the contrary at the motion to enforce the settlement.

Indeed, a contrary result makes no sense: NEMS has to enter into a False Claims Act settlement to obtain a False Claims Act release from the government. To the extent that NEMS suggests that the form of the settlement necessarily brands it a repeat offender (*see* ECF No. 195 at 12), the court does not see how this is necessarily so, given that the conduct is old, predates the current CEO, and covers much of the same time period as *NEMS I* (even if the covered conduct is different). Moreover, the government made substantial concessions – beyond HHS's foregoing its standard CIA – to address NEMS's concerns. NEMS's argument does not alter the conclusion that NEMS got

UNITED STATES DISTRICT COURT
For the Northern District of California

what it bargained for: dismissal of the case without a CIA, with a settlement number in a restitution landscape, and with the litigation insulation of a False Claims Act release.

**C. There was a "meeting of the minds" on Case No. 10-2433**

One last point remains. NEMS argues that there was no "meeting of the minds" with respect to the Medicare Part D case, case number 10-2433. (ECF No. 195 at 13-14.) "In particular," NEMS had the "understanding that the tentative agreement included the resolution of the Part D case (C 10-2433) through the 'state audit process,' and that [the undersigned] would have continuing jurisdiction to resolve that dispute in the event the parties were unable to do so." (*Id.*) NEMS expresses a concern that, in fact, the "state [audit] process would not include a resolution of" case 10-2433. (*Id.*) The court sees no difficulty here. The parties clearly agreed that, "upon completion of the audit process, NEMS will then dismiss the 10-2433 case." (ECF No. 189-1 at 13.) There is no room to find a lack of mutual assent to this part of the agreement. That being said, what is at issue here is only the federal and state governments' motion to enforce the settlement of the 10-1904 and 12-2895 case. Different state representatives were involved in the 10-2433 case. Accordingly, the court does not order enforcement of the agreement at this time on the 10-2433 case.

To the extent that NEMS argues that the transcript reflects a global resolution of all cases that stand or fall together, the court rejects that argument too. The settlements were separate, and the parties put them on the record separately. The process in the 10-2433 case was different in that it required resolving the audit issues (with the undersigned's retaining jurisdiction) before NEMS would let go of its 10-2433 lawsuit. By contrast, HHS's letting go of the CIA was in return for NEMS's "implementing" and engaging in the audit process. The court recognizes that in its brief and at the January 8, 2015, hearing, NEMS identified concerns with the state audit process. (ECF No. 195 at 8-10.) To address these concerns, the state – including a state supervisor who is part of the audit process – met with NEMS separately to give some comfort about and insight into what the process might look like. But those concerns are not relevant to the court's analysis both because the 10-2433 case is not part of the motion to enforce and because the 10-1904 settlement requires only implementing and engaging in the audit process, not resolving it.

## CONCLUSION

The court grants the governments' motion to enforce the settlement agreement in cases 10-1904 and 12-2895. This resolves ECF No. 189 (in 10-1904) and 112 (in 12-2895).

**IT IS SO ORDERED.**

Dated: January 13, 2015

_____
Laurel Beeler
United States Magistrate Judge