JAMES T. DIAMOND, JR., State Bar #131525
email: jdiamond@goldfarblipman.com
GOLDFARB & LIPMAN LLP
1300 Clay Street, Eleventh Floor
Oakland, California 94612
Telephone: (510) 836-6336
Facsimile: (510) 836-1035

Attorneys for Loi Trinh and
Ta-Chiang Hsu, Relators

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF CALIFORNIA, *ex rel.* LOI TRINH and ED TA-CHIANG HSU,<br><br>Plaintiffs,<br><br>v.<br><br>NORTH EAST MEDICAL SERVICES,<br><br>Defendant.<br>_____ | Case No.  10-cv-1904 CW (LB)<br><br>DECLARATION OF JAMES T. DIAMOND, JR. IN SUPPORT OF RELATORS' MOTION FOR ATTORNEYS' FEES AND COSTS<br><br>Date:   October 6, 2015<br>Time:  2:30 p.m.<br>Place:  Courtroom 2, 4th Floor, Oakland, CA<br><br>The Honorable Claudia Wilken |

I, JAMES T. DIAMOND, JR., declare as follows:

1.     I am a partner at Goldfarb & Lipman LLP, counsel of record in this action for Relators Loi Trinh and Ed Ta-Chiang Hsu.  I make this declaration in support of Relators' Motion for Attorneys' Fees.  I was and am the day-to-day partner responsible for managing this litigation and am familiar with all aspects of this case, including all matters related to time keeping.  I have personal knowledge of the matters set forth below and if called as a witness, I could and would testify competently thereto.

## TIMEKEEPERS AND SUMMARY OF QUALIFICATIONS

2.     Relators seek attorneys' fees for legal work performed by the following individuals in connection with this litigation: Xochitl Carrion and me.

five and a half years I have worked on this case. I was careful to manage this litigation so that both I and Ms. Carrion were efficient in our work.

7.     In preparing this motion, I reexamined the billing entries and used "billing judgment." Ms. Carrion and I worked on tasks separately, where possible, and duplicative billings were written off. I exercised billing discretion to delete from the bill time that was not reasonably necessary to the prosecution of this action. I also deleted entries for all attorneys who did not work more than 15 hours on this case, including other partners in my firm. I am confident that the number of hours billed are commensurate with the tasks that needed to be performed.

8.     My review of the billing entries gave me concern that attaching the document in its entirety could lead to the disclosure of attorney-client confidences and/or communications protected from disclosure by the attorney work product and/or joint prosecution privileges. It is in part for that reason a complete copy of the billing entries is not attached. However, in order to aid the Court in ruling on this motion, Relators will make the billing entries available for *in camera* review by the Court.

9.     The below chart reflects the amount of time spent by myself and Ms. Carrion and the general description of the work/responsibilities performed by each of us from the inception of our work on this matter in March 2010, up through August 31, 2015:

| Attorney | Hours | Description of Work |
|---|---|---|
| James T. Diamond, Jr. | 595.7 | Day-to-day handling of all aspects of case |
| Xochitl Carrion | 83.8 | All aspects of discovery |

10.     Goldfarb & Lipman has represented Relators on a fully contingent basis. In doing so, we were precluded from taking on and devoting resources to other cases and potential new

matters.  In agreeing to represent Relators in this matter, Goldfarb & Lipman assumed the significant risk that we would not be paid, since we undertook the representation on a contingent basis.

11.      Goldfarb & Lipman undertook substantial and challenging work in connection with this case, involving highly complex legal and factual issues.

12.      We are seeking an award here based on rates for my work at $625/hour, and for Ms. Carrion's work at $285/hour.  Because Goldfarb & Lipman's clients are primarily public entities and non-profit corporations, we do not bill at the current market rate for the San Francisco/Oakland/San Jose Bay Area market.  Under applicable case law authorities cited in our brief filed concurrently herewith, Goldfarb & Lipman is entitled to an award of attorneys' fees based on the market rate for the Bay Area.  Based on my review of the attorneys' fees awarded in California matters set forth in Mr. Pearl's declaration submitted concurrently herewith, my experience, my review of cases in which attorneys' fees were awarded, and my legal experience, I believe that the rates sought here are fair and reasonable.

13.      Based on my legal experience and personal familiarity with the work performed and the results achieved in this case, I believe that the hours spent on this case and sought by this motion are reasonable.  I therefore believe that the fees sought based on the rates requested and hours expended set forth in this chart are more than fair and reasonable:

| Attorney/Timekeeper | Rate | Hours | Value |
|---|---|---|---|
| James T. Diamond | $625.00 | 595.7 | $372,312.50 |
| Xochitl Carrion | $285.00 | 83.8 | $ 23,883.00 |
| **TOTALS** | | 679.5 | $396,195.50 |

## CERTIFICATION OF COMPLIANCE WITH CIVIL L.R. 54-5(b)(1)

14.      On August 21, 2015, I sent an email to counsel for Defendants to initiate the meet and confer process on attorneys' fees as required by Civil L.R. 54-5(b)(1).  I had a conference

call with counsel for NEMS on September 1, 2015, but the parties were unable to reach agreement.

## SUMMARY OF WORK PERFORMED

15.     This false claims act case involved complex legal and factual issues involving state and federal law.  Prior to the filing of the Complaint in this action, I spent considerable time researching potential legal claims, reviewing documents, and meeting with and conducting extensive interviews of my clients to gather the facts for the complaint.

16.     After this initial period, we prepared the complaint and the disclosure statement required to be filed in support of a false claim act complaint.  We then organized the filing and service of the complaint on both the United States and the State of California attorneys general under seal.

17.     After the complaint was filed, the federal and state governments had the right to decide whether to intervene in the action.  In this case, the governments sought and were granted multiple extensions of time to make the decision on whether to intervene.  During that period, Relators were interviewed by government counsel and officials multiple times; we provided further documents to the governments' counsel; we prepared a supplemental disclosure statement; and, we responded to many questions and information requests from government counsel.  I also reviewed and conducted research on the issues and cases cited in the briefs in connection with the peremptory lawsuit filed by Defendant against the federal and state governments. (Case No. 12-2895.)

18.     After the governments intervened in this action in late 2012, although we did not have primary responsibility for the litigation I remained actively involved throughout the course of the entire litigation.  I reviewed the briefs and cases cited, and performed legal research on the issues raised in the motion to dismiss filed by Defendant, and in its appeal of the denial of that motion.  We prepared an initial disclosure.  We continued throughout the litigation to respond to the governments' requests for information, to identify potential witnesses, and to respond to all

requests for assistance from government counsel.

19.     This case was aggressively litigated by Defendants' counsel, including the filing of an additional lawsuit, filing two appeals of interlocutory rulings that were ultimately dismissed, requests for reconsideration, and discovery disputes that lead to discovery motions.  I monitored all of these developments, and reviewed the briefs, supporting exhibits and declarations and rulings, and conducted research as appropriate, since all of these filings by Defendant effected Relators' case in some manner.

20.     Relators participated in a settlement conference in July 2013, and a further settlement conference in August 2013.  When the case did not settle, discovery began.  Due to the complex legal and factual issues involved in this case, more than a dozen depositions of NEMS employees, state employees and expert witnesses were taken.  We attended these depositions, and also prepared deposition questions and topics for those depositions when requested by governments' counsel.  Additionally, both relators were prepared for deposition, were deposed, and produced further documents to Defendant.  We prepared a lengthy privilege log.

21.     Cross motions for summary judgment were filed.  We drafted declarations in support of the governments' motion and reviewed drafts of the opening and reply briefs.  We conducted independent legal research as appropriate.  In its motion for summary judgment, Defendant sought to dismiss Relators from this action.  We researched, drafted and revised the sections of the governments' brief in opposition to Defendants' motion seeking to dismiss Relators.

22.     Relators also spent considerable time working towards the settlement of this action.  This case was settled on August 28, 2014.  However, multiple further appearances were required to finalize the settlement and, as the Court is aware, ultimately Relators and the governments moved the Court to enforce the settlement agreement. I reviewed and provided comments on the draft opening and reply brief in support of the motion, performed legal research

on the issues involved, and attended the hearing on the motion.

23.     After NEMS filed its appeal of the order enforcing the settlement agreement, I reviewed and provided comments on the draft opening and reply brief in support of the motion to dismiss the appeal and performed legal research on the issues involved.

24.     Because the parties did not come to an agreement on Relators' attorneys' fees, I conducted legal research and drafted the brief and worked on the supporting declarations in support of this motion.

25.     In addition to the above, Relators' counsel performed many other tasks over the more than five years that this case has been pending: researched other legal issues; drafted court documents; attended hearings; met with governments' counsel; met and conferred with Defendant's counsel; responded to questions and information requests from the government attorneys; prepared for trial; and, the myriad other tasks that come with litigation.

26.     Relators' request for reasonable costs in the amount of $2,745.92 incurred in this action are set forth in a bill of costs filed by September 2, 2015. These costs were reasonably and necessarily incurred in this matter.

27.     Attached hereto as **Exhibit C** is a true and correct copy of this Court's Order Granting in Part the Governments' Motion for Summary Judgment; Denying the Centers' Cross-Motion for Summary Judgment; Denying the Centers' Motion to Strike, filed May 3, 2014.

I declare under penalty perjury that the foregoing is true and correct, and that this declaration was executed on the 1st of September 2015 at Oakland, California.


                                    _____/s/_____
                                    JAMES T. DIAMOND, JR.

**EXHIBIT A**

Goldfarb & Lipman LLP

**JAMES T. DIAMOND, JR.**
jdiamond@goldfarblipman.com

1300 Clay Street, 11th Floor
Oakland, CA 94612

Oakland
510 836-6336

Los Angeles
213 627-6336

San Diego
619 239-6336

goldfarblipman.com

Mr. Diamond is a partner in the firm. For over twenty-seven years he has defended municipalities and public entity clients in a variety of litigation matters in state and federal courts throughout his twenty years of practice. This representation includes defense of civil rights lawsuits; Ralph M. Brown Act litigation; Meyers-Milias-Brown Act litigation; Fair Housing Act litigation under state and federal law; relocation law litigation under state and federal relocation laws; prevailing wage litigation; public contracting dispute litigation; breach of contract; and premises liability defense.

Mr. Diamond's employment litigation experience includes litigation and counseling in matters involving sex, race, age, physical disability, sexual orientation and national origin discrimination; harassment; wage and hour law claims; wrongful termination; and retaliation and whistle-blower claims. He has participated in labor union arbitrations and prepared company responses to employee charges filed with state and federal anti-discrimination agencies. He counsels employers in areas including discipline and termination; leave and disability laws; harassment prevention; wage and hour law issues; development of employee policies and procedures; meet and confer obligations; grievance and Skelly hearing issues; and, general labor law issues.

**Professional Experience**

Goldfarb & Lipman LLP, Oakland, California, 2004–present.

Partner, Stevens & Diamond, Oakland, California, 2003–2004.

Of Counsel, Grillo & Stevens, and a separate solo law practice, 1998–2004.

Partner, Friederichs Law Firm, Minneapolis, Minnesota, and a separate solo law practice, 1994–1998.

Associate, Arnelle & Hastie, San Francisco, California, 1987–1994.

**Education**

J.D., Hastings College of the Law, San Francisco, California, 1987.

B.A., University of San Francisco, cum laude, 1980.

**Professional & Volunteer Affiliations**

State Bars of California and Minnesota.  Member, Labor & Employment Law section of the State Bar of California.  Former board member of the Bay Area Urban League.  Mr. Diamond provides pro bono legal representation to clients through the Bar Association of San Francisco, the AIDS Legal Referral Panel, and the Minnesota State Public Defender's Office.

**EXHIBIT B**

# goldfarb lipman attorneys

**XOCHITL CARRION**
xcarrion@goldfarblipman.com

1300 Clay Street, 11th Floor
Oakland, CA 94612

Oakland
510 836-6336

Los Angeles
213 627-6336

San Diego
619 239-6336

goldfarblipman.com

Ms. Carrion's practice emphasizes the areas of affordable housing, tax-exempt entities, community economic development, employment law and litigation. She represents nonprofit organizations on the development, financing and management of affordable housing and mixed use projects and programs which utilize local funds, state assistance, including MHP and MHSA financing, and federal assistance, including, CDBG, NSP and HOME financing.

Ms. Carrion has substantial litigation experience, including arguing writs and motions, taking and defending depositions, drafting pre-trial motions (including motions for summary judgment), and sitting second chair in a jury trial and an arbitration. Her employment practice includes representation of employers in discrimination, termination, wage and hour, and harassment matters in state and federal courts. She also provides counseling advice to the firm's clients on employment and labor law issues.

Prior to joining the firm, Ms. Carrion was the Assistant Director for the Center for the Study of Los Angeles at Loyola Marymount University. While at the Center, Ms. Carrion was part of a collaborative team that developed the Latina/o Scorecard, which assessed the housing market in relations to the growing Latina/o population in Los Angeles, as well as produced several research reports that focused on the development of status through homeownership.

**Professional Experience**

Goldfarb & Lipman LLP, Oakland, California, 2007 – present.

Assistant Director, Center for the Study of Los Angeles at Loyola Marymount University.

**Education**

J.D., Hastings College of the Law, San Francisco, California. *2007*

Bachelor of Arts, University of California, Los Angeles, Highest Honors. *2004*

**Professional & Volunteer Affiliations**

Member, California Law Revision Commission (Chair, 2012-2013). 2013 and 2014 Northern California Rising Star, Super Lawyers. State Bar of California. American Bar Association. Forum on Affordable Housing and Community Development Law. Hispanic National Bar Association. Member, San Francisco La Raza Lawyers Association (President, 2011). Member, East Bay La Raza Lawyers Association. Bar Association of San Francisco. Latina Lawyers Bar Association. Member, Hispanic National Bar Association, Lesbian, Gay, Bisexual, and Transgender Section.

**EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>

UNITED STATES OF AMERICA and
STATE OF CALIFORNIA ex rel. LOI
TRINH and ED TA-CHIANG HSU,

        Plaintiffs,

   v.

NORTHEAST MEDICAL SERVICES, INC.,

        Defendant.

_____/

</td><td>

No. C 10-1904 CW

ORDER GRANTING IN
PART THE
GOVERNMENTS'
MOTION FOR SUMMARY
JUDGMENT; DENYING
THE CENTERS'
CROSS-MOTION FOR
SUMMARY JUDGMENT;
DENYING THE
CENTERS' MOTION TO
STRIKE (Docket
Nos. 93, 114, 143)

</td></tr>
<tr><td>

NORTHEAST MEDICAL SERVICES, INC.,

        Plaintiff,

   v.

CAL. DEP'T HEALTH CARE SERVICES;
TOBY DOUGLAS, Director of the
Cal. Department of Health Care
Services; CAL. HEALTH & HUMAN
SERVICES AGENCY; STATE OF
CALIFORNIA; U.S. DEP'T HEALTH &
HUMAN SERVICES; KATHLEEN
SEBELIUS, Secretary of Health and
Human Services;

        Defendants.

_____/

</td><td>

No. C 12-2895 CW
(Docket Nos. 68,
86)

</td></tr>
<tr><td>

NORTHEAST MEDICAL SERVICES, INC.,

        Plaintiff,

   v.

CAL. DEP'T HEALTH CARE SERVICES;
TOBY DOUGLAS, Director of the
Cal. Department of Health Care
Services; CAL. HEALTH & HUMAN
SERVICES AGENCY; STATE OF
CALIFORNIA,

        Defendants.

_____/

</td><td>

No. C 10-2433 CW
(Docket Nos. 67,
81)

</td></tr>
</table>

United States District Court
For the Northern District of California

LA CLINICA DE LA RAZA, INC.,

       Plaintiff,

     v.

CAL. DEP'T HEALTH CARE SERVICES;
TOBY DOUGLAS, Director of the
Cal. Department of Health Care
Services; CAL. HEALTH & HUMAN
SERVICES AGENCY; STATE OF
CALIFORNIA,

       Defendants.[1]

_____/

No. C 10-4605 CW
(Docket Nos. 50,
65)

    The parties in these four related actions dispute the scope of their respective obligations under the Medicaid and Medicare Acts. In the first of these actions, the United States of America and the State of California (collectively, the Governments) assert claims against Northeast Medical Services, Inc. (NEMS) under the federal False Claims Act (FCA) and California False Claims Act (CFCA). NEMS asserts counterclaims for declaratory and injunctive relief in that action and, in a separate action, asserts related claims challenging the Governments' implementation of the Medicaid program. Finally, in the two remaining actions, NEMS and La Clinica de la Raza, Inc. (collectively, the Centers) assert claims for declaratory and injunctive relief against various California healthcare agencies and administrators, challenging their implementation of the Medicare Part D program.

    The Governments move for summary judgment in all four actions. The Centers cross-move for summary judgment and move to strike the Governments' post-hearing filings. After considering

---

    [1] The Court has substituted Toby Douglas as a Defendant in the 10-2433 and 10-4605 actions pursuant to Federal Rule of Civil Procedure 25(d).

United States District Court
For the Northern District of California

1   the parties' submissions and oral argument, the Court grants in

2   part the Governments' motion for summary judgment and denies it in

3   part, denies the Centers' cross-motion for summary judgment, and

4   denies the Centers' motion to strike.

5                              BACKGROUND

6       The Centers are nonprofit healthcare organizations which

7   provide medical services to low-income communities in the San

8   Francisco bay area.  Each organization receives funding from the

9   United States and the State of California under the Medicaid and

10  Medicare programs for operating as a "federally-qualified health

11  center" (FQHC).  As a condition of this funding, the organizations

12  are required to report certain information about their operations

13  and finances to the Governments.

14      Two of these actions (Civil Case Nos. 10-1904 and 12-2895)

15  arise out of a dispute concerning the scope of NEMS's financial

16  reporting obligations under the Medicaid Act.  The other two

17  actions (Civil Case Nos. 10-2433 and 10-4605), which were

18  originally assigned to the Hon. Richard Seeborg of this Court,

19  arise out of a dispute concerning the Governments' chosen method

20  of reimbursing the Centers for certain services they provide under

21  the Medicare Part D program.  Each of these disputes is outlined

22  below.

23      A.    The Medicaid Act and the 10-1904 and 12-2895 Actions

24      Medicaid is a federal program that offers participating

25  states financial assistance to provide medical services to the

26  poor.  "Participation by states is voluntary, but those that

27  choose to participate must comply both with statutory requirements

28  imposed by the Medicaid Act and with regulations promulgated by

                                 3

Case 4:10-cv-01904-CW Document 147 Filed 05/13/14 Page 4 of 28

the Secretary of Health and Human Services." <u>Alaska Dep't of Health & Soc. Servs. v. Centers for Medicare & Medicaid Servs.</u>, 424 F.3d 931, 935 (9th Cir. 2005). One of these requirements is that participating states fully reimburse FQHCs, like the Centers, for the services they provide to Medicaid enrollees. 42 U.S.C. § 1396a(bb).

California participates in Medicaid through its Medi-Cal program. Cal. Welf. & Inst. Code § 10740. It is therefore required to reimburse FQHCs for their reasonable costs in providing healthcare to Medicaid enrollees. The state reimburses each FQHC at a facility-specific rate based on the average amount that FQHC spends each time an eligible beneficiary visits the facility.[2] Reimbursement payments are calculated by multiplying the facility's per-visit reimbursement rate by the number of visits to that facility by eligible beneficiaries.

While California's Department of Healthcare Services (DHCS) bears primary responsibility for administering the Medi-Cal program, California also contracts with "managed care organizations" (MCOs) to provide care to program beneficiaries. The Medicaid Act expressly authorizes participating states to provide services through these MCOs. <u>See</u> 42 U.S.C. § 1396b(m). Typically, when a state enters into a contract with an MCO, the MCO assumes part of the state's responsibility for reimbursing FQHCs that serve Medicaid enrollees in the MCO's service area.

---

[2] The Department of Health and Human Services determines each FQHC's average cost-per-visit by taking the FQHC's reported average cost-per-visit during fiscal years for 1999 and 2000 and adjusting that figure annually according to the "Medicare Economic Index." <u>See</u> <u>generally</u> 42 U.S.C. § 1396a(bb) (describing the payment system for reimbursing FQHCs).

United States District Court
For the Northern District of California

Docket No. 94,[3] 1st Zavala Decl. ¶ 16.  The MCO's specific payment obligations are usually set forth in a contract between the MCO and the FQHC.  If the MCO's payments fail to compensate the FQHC for its full costs in serving Medicaid enrollees -- that is, if the MCO's reimbursement rate falls below the FQHC's per-visit reimbursement rate -- then the state must provide the FQHC with a "supplemental payment" to make up for this shortfall.  42 U.S.C. § 1396a(bb)(5).  Federal law requires that these supplemental payments be made "pursuant to a payment schedule agreed to by the state and the Federally-qualified health center . . . , but in no case less frequently than every 4 months."  Id.

In California, these ongoing supplemental payments are known as "wraparound payments."  1st Zavala Decl. ¶¶ 12-14.[4]  FQHCs typically submit requests for these wraparound payments to DHCS on an "ongoing basis," which may be "daily, weekly, bi-weekly, or monthly, depending on each clinic's preference or business model."  Id. ¶ 12.  Whenever DHCS receives a payment request from an FQHC, the agency issues a wraparound payment "based on a weighted average of all MCO visits and payments received by [that] FQHC."  Id. ¶ 18.

Because these wraparound payments are based on estimates of how much each FQHC is owed, DHCS invites FQHCs to participate in an annual "reconciliation" process at the end of each fiscal year to ensure that every FQHC actually received full compensation for every Medi-Cal visit.  To participate in this process, the FQHC

_____

[3] Unless otherwise stated, all docket citations in this order refer to the docket in the 10-1904 action.

[4] The Governments also refer to these payments as "Code 18" payments.  1st Zavala Decl. ¶ 18.

must submit a reconciliation request to DHCS reporting how many Medi-Cal visits it received that year, how much money it expended on those visits (calculated according to the FQHC's facility-specific per-visit reimbursement rate), and how much money it received from MCOs for those visits. See 1st Zavala Decl., Exs. 4-5, 2013 DHCS Form 3097 & Instructions. If DHCS determines that its wraparound payments have not fully compensated the FQHC for the shortfall in MCO payments, then the agency pays the remaining amount. Conversely, if DHCS determines from the reconciliation request that the FQHC has been overcompensated, then the FQHC must return any excess funds to DHCS.

In May 2010, two former NEMS employees, Loi Trinh and Ed Ta-Chiang Hsu, filed a qui tam action (No. 10-1904) against NEMS, alleging that the organization had misreported financial information in several of its annual reconciliation requests. In particular, they alleged that NEMS had knowingly underreported the payments it received from a local MCO on its annual reconciliation reports in order to recoup inflated reconciliation payments from DHCS. Trinh and Hsu asserted claims on behalf of both Governments under the FCA, 31 U.S.C. §§ 3729 et seq., and CFCA, Cal. Gov't Code §§ 12650 et seq. They did not serve NEMS with their complaint, however, because the FCA precluded them from doing so until the Governments had an opportunity to investigate their allegations and decided whether or not to intervene. See 31 U.S.C. § 3730(b)(2). The docket therefore remained under seal until the Governments completed their investigation.

NEMS first learned that it was the subject of a federal investigation in May 2011 when the Department of Health and Human

United States District Court
For the Northern District of California

Services (HHS) served it with a civil investigative demand.
However, it did not learn of the 10-1904 action until February
2012, when representatives from HHS and the United States
Attorney's Office (USAO) for the Northern District of California
disclosed this information to NEMS during a conference call.  Two
months later, in April 2012, the USAO sent NEMS a letter to
inquire about the possibility of settling the 10-1904 action.

In June 2012, NEMS filed an action (No. 12-2895) against the
Governments seeking declaratory judgment that it had not
misrepresented its finances on any reconciliation reports and that
it had fully complied with the requirements of the Medicaid Act.
NEMS also asserted a claim for injunctive relief under 42 U.S.C.
§ 1983 charging DHCS and its director with failing to make fully
compensatory supplemental payments every four months, as required
to by the Medicaid Act.

This Court related the 12-2895 and 10-1904 actions in July
2012.  The following month, the United States elected to intervene
in the 10-1904 action, prompting the Court to unseal the docket in
that case.  After the State of California elected to intervene in
that action in January 2013, the Governments filed their joint
complaint-in-intervention against NEMS.  In the complaint, they
allege that NEMS failed to disclose all of the payments that it
received from the San Francisco Health Plan (SFHP), a local MCO,
on its annual reconciliation requests submitted to DHCS.  The
Governments assert that, as a result of NEMS's failure to report
this information, NEMS received, between 2001 and 2010, roughly
twenty million dollars in reconciliation payments to which it was
not entitled.

Case4:10-cv-01904-CW Document147 Filed05/13/14 Page8 of 28

In February 2013, this Court dismissed all but one of NEMS's claims in the 12-2895 action.  It found that NEMS had failed to establish federal subject matter jurisdiction over all of its claims other than the § 1983 claim against DHCS.  Because the dismissed claims arose from the same dispute as the Governments' claims against NEMS in the 10-1904 action, the Court granted NEMS leave to amend its dismissed claims and assert them as counterclaims in that action.  In May 2013, after unsuccessfully moving to dismiss the Governments' complaint-in-intervention, NEMS filed its answer in the 10-1904 action and asserted its previously dismissed claims as counterclaims.

B.    Medicare Part D and the 10-2433 and 10-4605 Actions

Medicare is a federal health insurance program that provides benefits to people with disabilities and people over age sixty-five.  See 42 U.S.C. §§ 1395 et seq.  The Medicare Act is divided into several parts, each of which deals with a different set of benefits.  Part D, which pertains to prescription drug benefits, is the only part relevant here.

In 2006, Congress passed legislation expanding Part D coverage to individuals who qualify for benefits under both Medicaid and Medicare, a group known as "dual-eligibles."  This legislation effectively shifted responsibility for paying dual-eligibles' prescription drug costs from state Medicaid programs to Medicare.  See 42 U.S.C. § 1396u-5(d)(1).  Because of this shift, FQHCs in California must now seek reimbursement under Medicare Part D, rather than Medi-Cal, for the prescription drug services they provide to dual-eligibles.  Previously, FQHCs were reimbursed for these services in the same way that they were reimbursed for

United States District Court
For the Northern District of California

all other of the other services they provided to Medi-Cal beneficiaries: that is, via the combination of wraparound and reconciliation payments described above.

DHCS offered FQHCs two options for seeking reimbursement for prescription drug services under Medicare Part D. Under the first option (Option 1), the FQHC would adjust its per-visit reimbursement rate by subtracting the costs of all prescription drug services, for both dual-eligibles and other Medi-Cal beneficiaries, and seek reimbursements directly from HHS for its services to dual-eligibles; DHCS would then reimburse the FQHC at a separate per-visit rate for the prescription drug services it provided to non dual-eligibles. Under the second option (Option 2), the FQHC would continue to receive reimbursements from DHCS at the same per-visit reimbursement rate but, during the annual reconciliation process, would pay back to DHCS any funding that the FQHC received under Medicare Part D during that fiscal year for its prescription drug services to dual-eligibles. Following the Part D expansion, NEMS and La Clinica both initially chose to proceed under Option 2. NEMS switched to Option 1 in 2009.

In June 2010, NEMS filed a declaratory judgment action (No. 10-2433) against DHCS and its director challenging the agency's efforts to implement the Medicare Part D expansion in California. Specifically, NEMS alleged that both reimbursement options offered by DHCS violated federal law. La Clinica, represented by the same counsel as NEMS, filed a nearly identical action (No. 10-4605) against DHCS and its director in October 2010. The two cases were consolidated in November 2010.

In June 2011, Judge Seeborg dismissed the Centers' claims. He found that, because the Centers were seeking to recover Part D funds that they had previously paid to DHCS under Option 2, they were essentially asserting claims against the State for retrospective monetary relief, which is precluded by the Eleventh Amendment.  The Centers appealed the order of dismissal in July 2011.

In April 2013, the Ninth Circuit affirmed the order of dismissal in part and reversed it in part.  North East Med. Servs. v. Cal. Dep't Health Care Servs., 712 F.3d 461, 470-71 (9th Cir. 2013) (NEMS).  It held that the district court properly found that the Eleventh Amendment barred the Centers from pursuing monetary relief but erred in dismissing the Centers' claims in their entirety.  It reasoned that some of the Centers' claims against the director of DHCS could potentially be construed as injunctive relief claims and "under Ex parte Young, the Eleventh Amendment generally does not bar suits for prospective, non-monetary relief against state officers."  Id. at 466.  The court highlighted two claims, in particular, that might fall under the Ex Parte Young exception to the Eleventh Amendment.  First, it found that one of NEMS's claims could be construed as claim for prospective relief insofar as NEMS was seeking to avoid future liability for its past failures to comply with Option 2, such as when it refused to pay DHCS the Medicare Part D money that it received in 2008.  Id. at 470 ("While California has not demanded payment, it has maintained that it is entitled to it.  This leaves open the possibility that California will prospectively apply Option 2 to NEMS for fiscal year 2008 when California tries to extract payment from NEMS in

the future."). Second, the court found that one of La Clinica's claims might also be construed as a claim for prospective relief insofar as it was seeking to avoid complying with its obligations under Option 2 in the future.[5] Id. ("La Clinica continues to pay Medicare Part D payments over to California under Option 2. As such, it argues that it is entitled to declaratory and injunctive relief barring any future attempt by California to collect La Clinica's Part D payments."). Because the Ninth Circuit found that both of these claims "arguably seek genuine prospective relief," id. at 466, it remanded "to allow the district court to assess Ex Parte Young's application to: (1) NEMS's claim to injunctive relief for fiscal year 2008, and (2) La Clinica's claims arising from prospective application of Option 2." Id. at 471.

C.   The Instant Motions

In April 2013, one week after the Ninth Circuit issued its decision, this Court related the 12-2895 and 10-1904 actions to the 10-2433 and 10-4605 actions and set a consolidated briefing schedule for dispositive motions in all four actions. Pursuant to that schedule, the Governments jointly submitted their consolidated motion for summary judgment in September 2013. The Centers jointly cross-moved for summary judgment in November 2013.

---

[5] The Ninth Circuit did not find that NEMS's claims for declaratory relief regarding DHCS's future enforcement of Option 1 contained a prospective component. This is likely because "NEMS conceded in both its briefing and at oral argument that it suffers no ongoing harm since proceeding under Option 1." NEMS, 712 F.3d at 465.

**United States District Court**
For the Northern District of California

DISCUSSION

I.   Motions for Summary Judgment

     A.   Legal Standard

     Summary judgment is properly granted when no genuine and

disputed issues of material fact remain, and when, viewing the

evidence most favorably to the non-moving party, the movant is

clearly entitled to prevail as a matter of law.  Fed. R. Civ.

P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

1987).

     The moving party bears the burden of showing that there is no

material factual dispute.  Therefore, the court must regard as

true the opposing party's evidence, if supported by affidavits or

other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg,

815 F.2d at 1289.  The court must draw all reasonable inferences

in favor of the party against whom summary judgment is sought.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952

F.2d 1551, 1558 (9th Cir. 1991).

     Material facts which would preclude entry of summary judgment

are those which, under applicable substantive law, may affect the

outcome of the case.  The substantive law will identify which

facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  Where the moving party does not bear the burden

of proof on an issue at trial, the moving party may discharge its

burden of production by either of two methods:

          The moving party may produce evidence negating
          an essential element of the nonmoving party's

12

> case, or, after suitable discovery, the moving
> party may show that the nonmoving party does
> not have enough evidence of an essential
> element of its claim or defense to carry its
> ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

Case4:10-cv-01904-CW Document147 Filed03/13/14 Page14 of 28

B.   No. 10-1904

1.   The Governments' Medicaid Claims

The Governments assert that NEMS violated the FCA and CFCA by underreporting the payments it received from SFHP on the reconciliation requests it submitted to DHCS between 2001 and 2010.  NEMS contends that it cannot be held liable under the FCA and CFCA because it was not required to report all its SFHP payments to DHCS under the Medicaid Act.

The FCA imposes civil liability on anyone who knowingly presents the federal government with "a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a); Alderson v. United States, 686 F.3d 791, 794 (9th Cir. 2012).  The statute is "'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.'"  United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1170 (9th Cir. 2006) (quoting United States v. Neifert-White Co., 390 U.S. 228, 232 (1968)).  The Ninth Circuit has held that "the scope of false or fraudulent claims should be broadly construed."  Id.

The CFCA imposes civil liability on any person who knowingly presents "a false or fraudulent claim for payment or approval" to the State of California or one of its political subdivisions. Because the CFCA is based on the FCA, California courts typically look to FCA precedents to construe the scope of the CFCA.  State v. Altus Fin., S.A., 36 Cal. 4th 1284, 1299 (2005) ("[T]he CFCA 'is patterned on similar federal legislation' and it is appropriate to look to precedent construing the equivalent federal act." (citations omitted)).

United States District Court
For the Northern District of California

Here, the Governments have submitted sufficient evidence to support an inference that NEMS deliberately withheld information in its annual reconciliation requests about certain payments it received from SFHP.  They point to a declaration from Hsu -- one of the relators in this action and NEMS's former chief financial officer -- in which he states that NEMS's chief executive officer, Sophie Wong, specifically instructed him in 2008 not to report all of the SFHP payments on the organization's reconciliation requests.  Docket No. 98-1, Hsu Decl. ¶¶ 7-8.  Hsu states that, even after he warned Wong that it was potentially illegal to withhold this information, "Wong told [him] not to report all of the SFHP payments received by NEMS on the FQHC reconciliation reports."  Id. ¶ 8.  He also asserts that he was "forced to resign" shortly after one of his discussions with Wong about whether or not to report the SFHP payments.  Id. ¶ 9.  These statements are sufficient to support an inference that NEMS deliberately reported false information on its reconciliation requests.

In addition to the Hsu declaration, the Governments have submitted a copy of DHCS's current reconciliation request form, which specifically instructs FQHCs to "[r]eport **all** Medi-Cal Managed Care Plan payments (both fee-for-service {FFS} and capitated) in this column."  1st Zavala Decl., Ex. 5, Form 3097 Instructions, at 4 (bold and italic emphasis in original).  The Governments contend that these instructions show that, even if NEMS believed it was not required by the Medicaid Act to report every MCO payment it received to DHCS, or that these payments were not all material to the reconciliation request, its failure to

report "all" of these payments still constituted a violation of the FCA and CFCA.

NEMS does not dispute that it failed to report all of its SFHP payments in its reconciliation requests between 2001 and 2010.  It contends, however, that it was never required to report all of these payments to DHCS during that period.  For support, NEMS points to the 2005 version of DHCS's reconciliation request instructions, which contains slightly different language than the 2013 version submitted by the Governments.  Specifically, the 2005 version instructs FQHCs, "Report all Managed Care plan payments (both fee-for-service and capitated) for Medi-Cal and Medi-Cal/Medicare visits in this column."  Docket No. 108, Guevara Decl., Ex. K, at 3 (emphasis added).  NEMS asserts that the additional language in the 2005 version -- "for Medi-Cal and Medi-Cal/Medicare visits" -- justified its decision not to report all of its received SFHP payments because those payments were meant to cover more than just the costs of "Medi-Cal and Medi-Cal/Medicare visits."

NEMS asserts that its interpretation of this reporting requirement was consistent with the Governments' own understanding of the term "Medi-Cal and Medi-Cal/Medicare visits" during the relevant period.  NEMS cites the testimony of Ralph Zavala, an audit manager for DHCS, who acknowledged during his deposition that FQHCs sometimes provide "specialty" services that do not qualify as "Medi-Cal or Medi-Cal/Medicare visits."  Guevara Decl., Ex. B, Zavala Depo. 45:6-46:4.  If SFHP agreed to provide payments to NEMS to cover the cost of these specialty services -- as NEMS alleges -- then NEMS may have been justified in reporting only a

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

portion of the money it received from SFHP on its annual reconciliation requests.

NEMS has not presented sufficient evidence to establish that it had such an agreement with SFHP.[6]  Nor has NEMS presented sufficient evidence to show that the reconciliation request instructions included the term "Medi-Cal or Medi-Cal/Medicare visits" every year between 2001 and 2010.  Most importantly, NEMS has not provided any evidence, other than the conclusory testimony of a former employee, to show that it actually incurred costs in providing specialty services and that the only payments it failed to disclose on its reconciliation reports were the SFHP payments intended to cover the costs of providing those specialty services.  Nevertheless, NEMS has presented sufficient evidence to support an inference that it did not knowingly report false information to DHCS on its reconciliation requests.

Accordingly, neither the Governments nor NEMS is entitled to summary judgment on the FCA and CFCA claims.[7]

---

[6] Although NEMS has provided a copy of its contract with SFHP, the contract, standing alone, does not make clear what proportion of SFHP's payments to NEMS are intended to cover specialty services and which are intended to cover Medi-Cal visits.

[7] The Governments indicated, both at the hearing and in their post-hearing submission, that NEMS's fraudulent conduct is apparent from the face of the reconciliation requests that it submitted between 2001 and 2010 because those reports documented how many Medi-Cal visits NEMS reported each year.  However, because NEMS has presented evidence to suggest that it was justified in reporting less than all of the payments it received from SFHP, the reconciliation requests are not sufficient, without more, to establish fraud.  To show fraud based on the documents alone, the Governments would have to identify some discrepancy or inconsistency in NEMS's own reporting practices, such as a discrepancy between the number of Medi-Cal visits reported in NEMS's interim supplemental payment requests and the number of such visits reported in its year-end reconciliation requests.

United States District Court
For the Northern District of California

2.   Relators' Medicaid Claims

NEMS argues that the relators waived their rights to assert any qui tam claims against it because they had both previously signed settlement agreements releasing various claims against the organization.  As explained at the hearing, even if the relators did waive their claims against NEMS -- and it is not clear that they did -- this would not protect NEMS against liability under the FCA or CFCA because the Governments have now intervened in this action and have assumed responsibility for prosecuting the FCA and CFCA claims.  If NEMS does not believe the Governments should pay the relators incentive awards under the FCA and CFCA, it would need to pursue an available remedy, if any, in an appropriate forum.  Although courts have some discretion to determine the size of a relator's incentive award under the FCA and CFCA, that discretion is limited to deciding how much to award the relator based on whether the government elected to intervene in the action and whether the action is founded "primarily on information of which the relator is not the original source." United States ex rel. Kelly v. Boeing Co., 9 F.3d 743, 747 (9th Cir. 1993) (citing 31 U.S.C. § 3730(d)).  The parties have not addressed this issue in their briefs.

3.   NEMS's Medicaid Counterclaims

NEMS asserts three counterclaims in the 10-1904 action.  The first two are directed at the Federal Government and appear to be based on the letter that the USAO sent NEMS in April 2012 to gauge its interest in settling the qui tam action.  In these counterclaims, NEMS asserts that the "legal conclusions expressed in the [USAO] letter" are "invalid," "contrary to law," and

United States District Court
For the Northern District of California

"inconsistent" with the Medicaid Act.  See Docket No. 60, NEMS's Answer & Counterclaims ¶¶ 135-36, 139-40.  NEMS appears to have abandoned these counterclaims at this stage.  It does not discuss either of them in its summary judgment briefs (except to withdraw one of them in a footnote to its reply brief) and has not submitted any evidence to support them here.  When asked at the hearing if there was any reason the Court should not grant summary judgment to the Federal Government on these counterclaims, NEMS replied that "you should go ahead and grant summary judgment on this."  Docket No. 140, 1/23/2014 Hrg. Tr. 27:24-28:2.  Thus, the Court grants summary judgment to the Federal Government on these counterclaims.

NEMS's third counterclaim is asserted against DHCS and is entirely duplicative of a claim that it previously asserted in the 10-2433 action.  In that claim, NEMS sought to recover certain Medicare Part D funds from DHCS for prescription drug services that it delivered prior to 2009.  Judge Seeborg found that this claim was barred by the Eleventh Amendment and the Ninth Circuit affirmed his dismissal of the claim.  NEMS, 712 F.3d at 766.  NEMS contends that the Ninth Circuit's decision dismissing this claim is no longer valid because the State subsequently waived its Eleventh Amendment immunity by electing to intervene in the qui tam action.

This argument is not persuasive.  The Ninth Circuit has held that when a state files suit against a defendant in federal court, it does not waive its Eleventh Amendment immunity with respect to all possible counterclaims that defendant might bring; rather, the state's waiver of Eleventh Amendment immunity is limited to those

19

1  counterclaims that "arise from the same transaction or occurrence
2  as the state's claim."  See In re Lazar, 237 F.3d 967, 978 (9th
3  Cir. 2001).  In this case, NEMS's counterclaim against DHCS does
4  not arise from the same transaction or occurrence as the State's
5  CFCA claim.  Indeed, NEMS's counterclaim arises from a dispute
6  concerning the State's implementation of the 2006 Medicare Part D
7  expansion, which is entirely distinct from any dispute concerning
8  NEMS's alleged failure to disclose its MCO payments on annual
9  reconciliation requests submitted between 2001 and 2010.
10 Accordingly, the State has not waived its Eleventh Amendment
11 immunity with respect to this counterclaim and the Ninth Circuit's
12 decision dismissing this claim in the 10-2433 action controls
13 here.  The State is therefore entitled to summary judgment on this
14 counterclaim.

15      C.   No. 12-2895: NEMS's Untimely Payments Action
16      NEMS's only remaining claim in the 12-2895 action is its
17 § 1983 claim based on DHCS's alleged failure to make timely
18 wraparound payments as required by the Medicaid statute.

19      As noted above, the Medicaid Act requires that participating
20 states make supplemental payments to FQHCs "pursuant to a payment
21 schedule agreed to by the State and the Federally-qualified health
22 center . . . , but in no case less frequently than every 4
23 months."  42 U.S.C. § 1396a(bb)(5).  Other courts have recognized
24 that an FQHC can bring a § 1983 action to enforce its right to
25 timely reconciliation payments under this provision.  Three Lower
26 Counties Cmty. Health Servs. v. Maryland, 498 F.3d 294, 303 (4th
27 Cir. 2007) ("At bottom, we conclude that the Medicaid Act requires
28 Maryland to pay FQHCs fully compensatory supplemental payments not

United States District Court
For the Northern District of California

less frequently than four months after Maryland has received the

claim for supplemental payment, as required by 42 U.S.C.

§ 1396a(bb)(5)."); Rio Grande Community Health Ctr., Inc. v.

Rullan, 397 F.3d 56, 75 (1st Cir. 2005) ("We conclude that a

private action can be brought by an FQHC under section 1983 to

enforce 42 U.S.C. § 1396a(bb).").

In Three Lower Counties, the Fourth Circuit held that

Maryland's system for making wraparound payments -- which, like

DHCS's system, relied on a combination of estimated interim

payments and year-end reconciliation payments -- violated

§ 1396a(bb).  498 F.3d at 296, 299 ("Under the practice Maryland

has adopted, the Department of Health makes a portion of the

supplemental payment in advance, labeling the prospective payment

as an 'interim supplemental payment,' and the remaining portion

retrospectively, labeling the balance as a payment in

'reconciliation' of the account.").  Citing the plain language of

the statute, the Fourth Circuit reversed the district court's

order granting summary judgment to the state agency tasked with

administering Medicaid in Maryland.  The appellate court explained

that Maryland's interim payments did not satisfy § 1396a(bb)

because they were not fully compensatory.  In reaching this

conclusion, the Fourth Circuit specifically rejected the district

court's reasoning that "it would be too administratively

burdensome for the Department of Health to make a fully

compensatory supplemental payment to FQHCs at least once every

four months."  Id. at 300.

Here, the record supports an inference that DHCS fails to

make fully compensatory wraparound payments every four months.

1   The Governments' own evidence indicates that DHCS's wraparound

2   payments are based on an estimate of the shortfall in MCO payments

3   made to each FQHC over a given billing period rather than the

4   FQHC's exact costs.  See 1st Zavala Decl. ¶ 15 (stating that

5   wraparound payments "consist of weighted averages of the

6   difference between a clinic's total revenue received from a

7   particular third party payer type and the amount the clinic would

8   have otherwise received if it had been reimbursed at the clinic's

9   PPS rate for providing the services that were partially reimbursed

10  by the third party payer" (emphasis added)).  Furthermore, DHCS's

11  own reconciliation request form states that it can take up to

12  three years for the agency to complete the reconciliation process.

13  See id., Ex. 5, 2013 DHCS Form 3097 & Instructions, at 1 ("The

14  Department has 3 years from date these forms are received and

15  accepted for processing, to determine if the total payments were

16  greater than or less than the provider's allowable PPS

17  reimbursement.").  This evidence is sufficient to support an

18  inference that DHCS's wraparound payment system violates

19  § 1396a(bb).

20       That said, a dispute of material fact remains as to whether

21  or not DHCS's wraparound payment system fully compensated NEMS in

22  particular for its FQHC services.  As noted above, the Governments

23  have presented sufficient evidence to support an inference that

24  NEMS repeatedly obtained inflated reconciliation payments from

25  DHCS by deliberately underreporting the payments it received from

26  SFHP on its reconciliation reports.  This evidence -- which

27  suggests that NEMS was over-compensated rather than under-

28

United States District Court
For the Northern District of California

1   compensated -- precludes the Court from granting summary judgment

2   to any party on this claim.

3          D.    Nos. 10-2433 and 10-4605: The Centers' Medicare Claims

4          As previously explained, the Ninth Circuit remanded these

5   actions "to allow the district court to assess Ex Parte Young's

6   application to: (1) NEMS's claim to injunctive relief for fiscal

7   year 2008, and (2) La Clinica's claims arising from prospective

8   application of Option 2." NEMS, 712 F.3d at 471.

9          With respect to NEMS's claim, Ex Parte Young does not apply

10  because NEMS is essentially seeking retrospective monetary relief.

11  The Ninth Circuit has made clear that "whether relief is

12  prospective or retrospective in the Medicaid payment context turns

13  on the date of service, not the date of payment." Independent

14  Living Center of S. Cal. v. Maxwell-Jolly, 572 F.3d 644, 661 n.19

15  (9th Cir. 2009), vacated and remanded on other grounds sub nom.

16  Douglas v. Indep. Living Ctr. of S. Cal., Inc., 132 S. Ct. 1204

17  (2012).  Thus, under the Eleventh Amendment, a healthcare provider

18  may not obtain an injunction to compel a state to reimburse it for

19  Medicaid or Medicare services that it has already rendered.

20  Wisconsin Hosp. Ass'n v. Reivitz, 820 F.2d 863, 867 (7th Cir.

21  1987) ("The hospitals argue that because no final settling up for

22  the year has been made, the judgment they seek is prospective

23  only: a direction to the defendants to ignore the April 30 statute

24  in deciding how much money to pay the hospitals.  But this is a

25  misuse of the word 'prospective.'").  Here, NEMS is seeking

26  compensation for prescription drug services that it provided in

27  2008, more than a year before it filed the 10-2433 action.

28  Although NEMS is seeking that compensation in the form of an order

United States District Court
For the Northern District of California

1  compelling DHCS to forgive its 2008 debt -- rather than an order

2  compelling a new payment -- the relief it is pursuing is still

3  retrospective in nature; it is seeking future monetary relief

4  based on past services.  Accordingly, NEMS's claim is barred by

5  the Eleventh Amendment.

6       La Clinica's claim, in contrast, is not barred by the

7  Eleventh Amendment because it is pursuing only prospective relief.

8  As noted above, La Clinica is seeking an injunction that would

9  release it from its obligation to comply with the requirements of

10 Option 2 in the future.  Because this injunction would not compel

11 DHCS to compensate La Clinica for services that it has already

12 rendered, the Eleventh Amendment does not preclude La Clinica from

13 pursuing this form of relief.

14      Nonetheless, La Clinica's claim fails for a different

15 reason -- specifically, because it still has the option to proceed

16 under Option 1 rather than Option 2.  Although the Centers

17 initially alleged that Options 1 and 2 are both unlawful, they

18 have not identified any illegality or harm associated with

19 Option 1.  The Ninth Circuit specifically noted that NEMS, which

20 was represented on appeal by the same counsel as La Clinica,

21 "conceded in both its briefing and at oral argument that it

22 suffers no ongoing harm since proceeding under Option 1." NEMS,

23 712 F.3d at 465.  More recently, at the summary judgment hearing,

24 the Centers stated that Option 1 is "irrelevant for the purposes

25 of this case, because it's been accepted by NEMS, and NEMS is not

26 complaining about Option One with respect to having moved to

27 Option One when it did in 2009." 1/23/2014 Hrg. Tr. 24:15-:18.

28 Later, when the Court asked if it needed to "worry about whether

24

**United States District Court**
For the Northern District of California

Option One is illegal or not," the Centers replied, "No, you do

not." Id. 25:16-:18.  Although the Centers stated at one point

that Option 1 might harm FQHCs by potentially exposing them to

increased competition from non-FQHCs, immediately after proposing

that theory, the Centers conceded that this increase in

competition "hasn't happened, and it's unlikely to happen." Id.

30:8-:17.  Because these concerns about the risks of proceeding

under Option 1 are highly speculative concerns and not supported

by the evidence, they do not provide adequate support for La

Clinica's injunctive relief claim.

In sum, NEMS has not overcome the State's Eleventh Amendment

immunity and La Clinica has not presented any evidence to suggest

that it cannot proceed under Option 1; La Clinica's rejection of

Option 2 is therefore moot.  Accordingly, the Governments are

entitled to summary judgment on the Centers' two remaining claims

in the 10-2433 and 10-4605 actions.

The Governments are also entitled to summary judgment on

these claims because the Centers have failed to present sufficient

evidence to support an inference that Option 2 is unlawful.[8] The

Centers allege that, under Option 2, they cannot obtain full

compensation for the prescription drug services they provide to

dual-eligibles because they are forced to report all of the

Medicare Part D funding they receive to DHCS rather than just the

portion of funds used to serve dual-eligibles.  The evidence in

the record does not support this allegation.  DHCS's instructions

---

[8] The Ninth Circuit and Judge Seeborg both focused exclusively on
the Eleventh Amendment issue in this case and did not reach the merits
of the Centers' claim that Option 2 is unlawful.

for submitting reconciliation requests state that FQHCs are only
required to report the portion of their Medicare Part D funds that
they received specifically for providing prescription drug
services to dual-eligibles.  The instructions direct the applicant
to "[r]eport the payments received from Medicare or its fiscal
intermediary for Medicare/Medi-Cal dual eligible patients who are
not enrolled in a Medi-Cal Managed Care Plan and are not enrolled
in a capitated MAP."  1st Zavala Decl., Ex. 5, 2013 DHCS Form 3097
& Instructions, at 5 (emphasis in original).  The only evidence
that the Centers cite to support their characterization of Option
2 is a provision of California's 2006 Medi-Cal plan amendment,
which says that DHCS will supplement certain third-party payments
to FQHCs.  This provision does not state or imply that FQHCs are
required to report all of the Medicare Part D funds they receive.
See 1st Zavala Decl., Ex. 1, 2006 State Plan Amendment, at 6S.[9]
Thus, even if NEMS's remaining claim was not barred by the
Eleventh Amendment and La Clinica's remaining claim was not moot,
the Governments would still be entitled to summary judgment on the
Centers' claims in these actions because the Centers have not
presented sufficient evidence to support an inference that Option
2 violates federal law.

II.  Motion to Strike

      On March 11, 2014, this Court issued an order directing the
Governments to provide a citation to certain billing records to

_____

      [9] The Centers describe a hypothetical FQHC in their brief to
illustrate their theory of how Option 2 could fail to compensate FQHCs
for their prescription drug services to dual-eligibles.  See Docket No.
114, Centers' Cross-Mot. & Opp., at 27.  However, they do not identify
any evidence to show that this hypothetical actually happened or could
happen to them.

United States District Court
For the Northern District of California

which they had alluded during the hearing.  The order instructed the Governments not to supplement the citation with any additional arguments or evidence; in the event that the summary judgment record did not contain the billing records, the order directed them to submit a brief statement saying so.  On March 13, 2014, two days after the Court issued its order, the Governments submitted a two-page statement asserting that the summary judgment record did not contain the billing records.  The Governments also provided various citations to the summary judgment record that were not responsive to the Court's original request.  One week later, on March 19, 2014, the Centers moved to strike the Governments' post-hearing submission, arguing that the Governments had failed to comply with the Court's instructions.

Because the Governments' post-hearing submission substantially complies with the Court's March 11, 2014 order, the Centers' motion to strike is denied.  To the extent that the Governments' post-hearing submission contains supplemental arguments or citations not directly responsive to the Court's order, the Court does not rely on those arguments or citations here.  The Court relies only on the portion of the Governments' submission stating that the summary judgment record does not contain the billing records identified in the Court's original order.

CONCLUSION

For the reasons set forth above, the Governments' motion for summary judgment (Docket No. 93) is GRANTED in part and DENIED in part.  The Centers' cross-motion for summary judgment (Docket No. 114) is DENIED and the Centers' motion to strike (Docket No. 143)

1   is DENIED as moot.  The only claims that remain in this action are

2   the Governments' FCA and CFCA claims against NEMS and NEMS's

3   § 1983 claim against the State based on DHCS's alleged failure to

4   comply with 42 U.S.C. § 1396a(bb).

5       The parties participated in a settlement conference with

6   Judge Beeler in August 2013.  Since then, they have not notified

7   the Court of any additional efforts to settle this case.

8   Accordingly, the Court directs the parties to participate in a

9   further settlement conference with Judge Beeler by September 10,

10  2014.  The parties shall ensure that all knowledgeable persons and

11  agency representatives are present at the settlement conference.

12      A final pretrial conference will be held at 2:00 p.m. on

13  October 8, 2014.  A five-day jury trial will commence at 8:30 a.m.

14  on November 3, 2014.

15      IT IS SO ORDERED.

16

17  Dated: 5/13/2014

    CLAUDIA WILKEN
    United States District Judge

18

19

20

21

22

23

24

25

26

27

28